**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Southern Division)**

| | |
|---|---|
| LEGAL EAGLE, LLC, *et al.*, | |
| Plaintiffs, | No. 8:26-cv-371-TDC |
| | No. 8:26-cv-847-TDC |
| v. | No. 8:26-cv-920-TDC |
| | No. 8:26-cv-1214-TDC |
| NATIONAL ARCHIVES AND RECORDS ADMINISTRATION, | |
| Defendant. | |

**<u>MEMORANDUM IN SUPPORT OF PARTIAL MOTION TO DISMISS AND FOR
JUDGMENT ON THE PLEADINGS</u>**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 2

I.      Statutory Background ............................................................................................. 2

        A.      Records Requests Under the PRA and FOIA ........................................... 2

        B.      Types of FOIA Requests and Their Administrative Exhaustion Rules ...... 2

        C.      Special Procedures in PRA Cases ............................................................. 3

II.     Procedural History ................................................................................................. 5

        A.      Factual Background .................................................................................... 5

        B.      Lawsuits, Consolidation, and Motion Practice ......................................... 6

LEGAL STANDARD ........................................................................................................ 6

ARGUMENT ..................................................................................................................... 7

THE PRA DISPLACES FOIA'S RESPONSE DEADLINES ........................................... 7

I.      The Text and Structure of the PRA Confirm that Its Notice Deadline Supersedes FOIA's
        Statutory Timeframe ............................................................................................... 7

II.     The PRA's Drafting, Legislative, and Implementation History Uniformly Confirm that
        Congress Never Intended FOIA's Response Deadline to Apply to the PRA ................... 10

        A.      Congress Knew It Needed to Balance Disclosure Against the Privilege
                Interests of Both Incumbent and Former Presidents ................................ 10

        B.      Congress Never Intended to Link Executive Privilege with FOIA
                Deadlines ................................................................................................... 11

        C.      To Accommodate the Presidents' Privilege Interests, the PRA's Timeline
                Plainly Overrides FOIA's Deadline ........................................................... 13

        D.      Instead of Questioning This Practice, Congress Formalized It ................. 16

CONCLUSION ................................................................................................................ 17

**TABLE OF AUTHORITIES**

PAGE(S)

**Cases**

*Alden v. Maine,*
    527 U.S. 706 (1999)........................................................................................ 13

*American Hosp. Ass'n v. Becerra,*
    596 U.S. 724 (2022)........................................................................................ 7

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007)........................................................................................ 6

*Biden v. Texas,*
    597 U.S. 785 (2022)........................................................................................ 8

*Dorsey v. United States,*
    567 U.S. 260 (2012)........................................................................................ 1

*Everytown for Gun Safety Support Fund v. Bureau of ATF,*
    984 F.3d 30 (2d Cir. 2020).............................................................................. 8

*Farmer v. Employment Sec. Comm'n of N.C.,*
    4 F.3d 1274 (4th Cir. 1993) ............................................................................ 8

*Garland v. Cargill,*
    602 U.S. 406 (2024)..................................................................................... 1, 7

*Henson v. Santander Consumer USA Inc.,*
    582 U.S. 79 (2017)...................................................................................... 16, 17

*Kissinger v. Reporters Committee for Freedom of the Press,*
    445 U.S. 136 (1980)........................................................................................ 9

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992)........................................................................................ 6

*Massey v. Ojanit,*
    759 F.3d 343 (4th Cir. 2014) .......................................................................... 6

*Mellouli v. Lynch,*
    575 U.S. 798 (2015)........................................................................................ 7

*Morton v. Mancari,*
    417 U.S. 535 (1974)........................................................................................ 8

*National Ass'n of Mfrs. v. Department of Defense*,
    583 U.S. 109 (2018) ............................................................................................ 7

*Nixon v. Administrator of General Services*,
    433 U.S. 425 (1977) ................................................................................. 1, 10, 11

*Niz-Chavez v. Garland*,
    593 U.S. 155 (2021) ............................................................................................ 8

*NLRB v. Noel Canning*,
    573 U.S. 513 (2014) .......................................................................................... 13

*Pollack v. DOJ*,
    49 F.3d 115 (4th Cir. 1995) ............................................................................ 2, 3

*Printz v. United States*,
    521 U.S. 898 (1997) .......................................................................................... 13

*Rodriguez v. United States*,
    480 U.S. 522 (1987) .......................................................................................... 17

*Ryan v. Gonzales*,
    568 U.S. 57 (2013) ............................................................................................ 11

*Thacker v. TVA*,
    587 U.S. 218 (2019) .......................................................................................... 17

*United States v. Under Seal*,
    709 F.3d 257 (4th Cir. 2013) .............................................................................. 8

*Zivotofsky ex rel. Zivotofsky v. Kerry*,
    576 U.S. 1 (2015) .............................................................................................. 13

**Statutes**

5 U.S.C. § 552 (1988) ............................................................................................ 2, 14

44 U.S.C. § 2203 ................................................................................................. 2, 3, 17

44 U.S.C. § 2204 ............................................................................................... *passim*

44 U.S.C. § 2206 ................................................................................................... 3, 12

44 U.S.C. § 2208 ................................................................................................. 1, 4, 14

Pub. L. No. 95-591, 92 Stat. 2523 (Nov. 4, 1978) ...................................................... 3

Pub. L. No. 104-231, 110 Stat. 3048, 3052, 3054 (Oct. 2, 1996) .................................................. 15

Pub. L. No. 113-187, 128 Stat. 2003 (Nov. 26, 2014) ..................................................................... 4

**Rules**

FED. R. CIV. P. 12(b)(1) ................................................................................................................. 6

FED. R. CIV. P. 12(c) ...................................................................................................................... 6

**Regulations**

36 C.F.R. § 1250.26 ....................................................................................................................... 4

36 C.F.R. § 1250.28 ....................................................................................................................... 2

36 C.F.R. § 1250.72 ....................................................................................................................... 3

36 C.F.R. § 1270.38 ....................................................................................................................... 2

36 C.F.R. § 1270.44 ..................................................................................................................... 14

41 C.F.R. § 105-63.206 (1976) .................................................................................................... 11

79 Fed. Reg. 56500 (Sep. 22, 2014) .............................................................................................. 4

82 Fed. Reg. 8901 (Feb. 1, 2017) .................................................................................................. 4

Executive Order 12667, 54 Fed. Reg. 3403 (Jan. 18, 1989) ........................................................ 14

Executive Order 13233, 66 Fed. Reg. 56025 (Nov. 1, 2001) ....................................................... 15

Executive Order 13489, 74 Fed. Reg. 4669 (Jan. 21, 2009) ........................................................ 15

**Other Authorities**

124 Cong. Rec. H34892 (Oct. 10, 1978) ................................................................................. 12, 13

124 Cong. Rec. S36843 (Oct. 13, 1978) ...................................................................................... 13

H.R. Rep. No. 95-1487 (Aug. 14, 1978) ................................................................................ 10, 11

H.R. Rep. No. 113-127 (June 25, 2013) ..................................................................... 3, 4, 15, 16

S. Rep. No. 113-218 (July 23, 2014) ............................................................................. 13, 14, 15

*Statement on Signing H.R. 13500 Into Law* (Nov. 6, 1978) ....................................................... 13

**INTRODUCTION**

When Congress enacted the Presidential Records Act (PRA) in 1978, it incorporated the Freedom of Information Act (FOIA) as a procedural vehicle for requesting presidential records. But it preserved the principle—recently upheld in *Nixon v. Administrator of General Services*, 433 U.S. 425 (1977)—that former Presidents were entitled to a reasonable notice period to raise executive privilege claims before Defendant National Archives and Records Administration (NARA) could produce said records. In 2014, Congress confirmed decades of practice by fixing the notice period to former Presidents at a minimum of 60 working days. *See* 44 U.S.C § 2208. The question presented is whether Plaintiff may sue after 20 working days (the deadline to respond to a generic FOIA request) on the basis that because the PRA uses FOIA as a vehicle, it uses *all* of FOIA—even the parts that would nullify an entire section of the PRA. The answer is no.

Congress enacted § 2208 to ensure that Presidents would have a fair opportunity to review documents for privilege before NARA released them to the public under the PRA. And Congress knew about FOIA's 20-day deadline when it enacted § 2208. "Congress presumably does not enact useless laws." *Garland v. Cargill*, 602 U.S. 406, 427 (2024) (citation omitted). Thus, when Congress enacts a new law against the backdrop of the old one, Congress is entitled "to apply the earlier statute but as modified" by the new one. *Dorsey v. United States*, 567 U.S. 260, 274 (2012). Here, applying FOIA's 20-day response deadline would flout the PRA's 60-day notice period. As such, the only plausible reading is that the FOIA's deadline does not apply to PRA requests to NARA. Since constructive exhaustion under FOIA occurs only if the agency breaches an applicable deadline, Plaintiffs have failed to exhaust administrative remedies. Because Plaintiffs have not exhausted remedies, most of their claims fail at the start and must be dismissed.

1

The statute is clear and calls for a straightforward conclusion: Plaintiffs must go through the usual administrative process before filing suit. The Court should dismiss Counts 2, 4, 6, and 8-12 in Case No. 26-371; all counts in 26-847; all counts in 26-920; and Counts 1 and 3-6 in Case No. 26-1214.

## BACKGROUND

### I.      Statutory Background

#### A.      Records Requests Under the PRA and FOIA

Under the Presidential Records Act of 1978 (PRA), Defendant NARA is "responsib[le] for the custody, control, and preservation of, and access to," former Presidents' records, and assumes custody of an Administration's presidential records after the respective President leaves office. 44 U.S.C. § 2203(g)(1). Five years after a Presidential administration ends, the public may request that administration's Presidential records through FOIA. *Id.* § 2204(c)(1); 36 C.F.R. § 1270.38.

The Donald J. Trump Presidential Library is part of NARA. It oversees records from the first Trump Administration (Trump 1). *Cf.* 44 U.S.C. § 2203(g)(2).

#### B.      Types of FOIA Requests and Their Administrative Exhaustion Rules

"[A] requester may generally seek judicial review of his FOIA request only after he has exhausted all administrative remedies." *Pollack v. DOJ*, 49 F.3d 115, 118 (4th Cir. 1995). To begin, a FOIA requester files her request with the agency. In exceptional cases, a requester may ask for expedited processing upon a showing of a "compelling need," or "in other cases determined by the agency." 5 U.S.C. § 552(a)(6)(E)(i), (v); *see also* 36 C.F.R. § 1250.28(a) (NARA's four criteria, two of which are from the FOIA statute). Expedited processing moves the request to the front of the agency queue. If the agency grants the expedite request, it must process the request "as soon as practicable." 5 U.S.C. § 552(a)(6)(E)(iii).

Absent an expedited processing request, the agency ordinarily must respond within 20 working days. *Id.* § 552(a)(6)(A)(i). An agency may grant itself a one-time extension of 10 working days. *Id.* § 552(a)(6)(B)(i). If the agency fails to respond within that timeframe, FOIA constructively exhausts the requester's administrative remedies. *Id.* § 552(a)(6)(C)(i).

After the agency responds, the requester may file an administrative appeal. NARA provides requesters 90 calendar days to appeal. 36 C.F.R. § 1250.72(a). The agency must process the appeal within 20 working days. Again, if the agency fails to respond within that timeframe, FOIA constructively exhausts administrative remedies. 5 U.S.C. § 552(a)(6)(A)(ii), (C)(i).

Unless a statutory exhaustion rule applies, requesters may not sue in district court until they have completed the administrative appeal process. *Pollack*, 49 F.3d at 118.

C.    **Special Procedures in PRA Cases**

Courts "shall" not interpret the PRA to "confirm, limit or expand any constitutionally-based privilege which may be available to an incumbent or former President." Pub. L. No. 95-591, 92 Stat. 2523, 2526 (Nov. 4, 1978), *codified at* 44 U.S.C. § 2204(c)(2). To effectuate privilege review, the PRA has always required NARA to promulgate regulations providing notice to the President in office when a given Presidential record was created (the "former President") whenever NARA intends to release Presidential records from that President's administration. *See* 44 U.S.C. § 2206(3). But when it was enacted, the PRA did not itself specify the process for "former presidents to request continued restricted access to presidential records created during their respective administrations." *Presidential and Federal Records Act Amendments of 2013* [sic], H.R. Rep. No. 113-127, at 5 (June 25, 2013). "To fill this gap, several presidents since the passage of the PRA … issued executive orders to formalize a request procedure and define the limits of such requests." *Id.* Those orders invariably gave incumbent and former Presidents a mandatory

3

notice period to review documents for executive privilege before NARA could disclose those documents to the public. *See infra* Argument § II.C. As NARA explained in September 2014, "[w]e can provide the final response [to a FOIA request] only at the end of the Presidential notification period set forth in the Executive order." *See NARA Records Subject to FOIA*, 79 Fed. Reg. 56500, 56508 (Sep. 22, 2014), *codified at* 36 C.F.R. § 1250.26(j).

The Presidential and Federal Records Act Amendments of 2014, Pub. L. No. 113-187, 128 Stat. 2003 (Nov. 26, 2014), formalized the executive privilege review process by adding a new Section 2208 to Title 44. Under that law, whenever NARA proposes releasing presidential records to the public, it must first notify the incumbent and former Presidents and provide them with 60 working days to review the proposed disclosures for potential assertion of a constitutionally based privilege. *See* 44 U.S.C. § 2208(a)(3)(A). Either President may unilaterally grant herself a one-time, 30-working-day extension to conduct this review. *Id.* § 2208(a)(3)(B). Additional delays may occur if a President chooses to make a privilege claim.[1] NARA amended the PRA regulation after Section 2208 was enacted, but not the statement that NARA could not respond to a PRA request until it completed the presidential notification period first. *See NARA Records Subject to FOIA*, 82 Fed. Reg. 8901, 8902 (Feb. 1, 2017) (amending 36 C.F.R. § 1250.26(h) but not § 1250.26(j)).

The privilege review period also facilitates a separate PRA mechanism, which also requires a former President's involvement. The PRA allows a President to designate certain categories of records as restricted for up to 12 years after her term ends. 44 U.S.C. § 2204(a). Unlike FOIA, PRA restrictions are not judicially reviewable if NARA upholds them; they are reviewable only if

---

[1] If a President invokes a constitutionally based privilege, NARA may not release the documents at the end of the 60-day period. 44 U.S.C. § 2208(a)(3)(A). NARA must uphold an incumbent President's assertion of privilege until a court orders otherwise. *Id.* § 2208(d)(2). That President may overrule a former President's assertion of privilege. *Id.* § 2208(c)(2)(C). If so, the former President may file suit to invoke the privilege over the incumbent President's objection. *Id.*

NARA declines to uphold a restriction and the former President challenges NARA's decision. *Id.* § 2204(b)(3), (e). NARA must consult with the former President before declining to uphold a restriction. *Id.* § 2204(b)(3).

## II.     Procedural History

### A.     Factual Background

The PRA authorized the public to request Trump 1 records on January 20, 2026, five years after President Trump left office for the first time. *See* 44 U.S.C. § 2204(b)(2)(A).

On January 20, Plaintiff National Security Counselors filed a series of PRA requests, which Plaintiff Legal Eagle later joined. NARA divided each request at issue in these lawsuits into requests for classified information (prefixed "NW") and unclassified information (prefixed with the year of the request). (NARA provides a table of requests in the appendix.) So divided, there are 22 requests at issue in these cases.

So far, NARA has provided a full response to one of Plaintiffs' requests, for classified minutes of meetings of the Interagency Security Classification Appeals Panel (ISCAP). NARA found no responsive records, and Plaintiffs asked NARA to inquire further. *See* Compl. ¶¶ 40-42 (No. 26-1214). NARA reaffirmed that its response was final, and Plaintiffs administratively appealed that response. *Id.* ¶¶ 43-45. NARA has not provided full responses to the other requests.

Plaintiffs also requested, and NARA timely denied, expedited processing of four requests related to the National Security Council's pre-publication review of John Bolton's 2020 book *The Room Where It Happened. See* FAC ¶¶ 39, 47, 61, 69 (No. 26-371), ECF 6.[2]

---

[2] The original complaint in No. 26-371 was filed nine working days after the requests, and wrongly alleged that NARA missed the deadline. Compl. ¶¶ 38, 48. The FAC corrected this allegation.

5

### B.    Lawsuits, Consolidation, and Motion Practice

Plaintiffs filed four lawsuits: No. 26-371 (the John Bolton case), No. 26-847 (the OLC case), No. 26-920 (the Mar-a-Lago case), and No. 26-1214 (the ISCAP case). Collectively, the cases divide into three parts.

- **Constructive records denial** (all counts except the below): Plaintiffs' overall allegation that NARA failed to respond to their requests within 20 working days.

- **Expedited processing denial** (Counts 1, 3, 5, and 7 in No. 26-371): The parties plan to cross-move for summary judgment.

- **Constructive appeal denial** (Count 2 in No. 26-1214): Defendant will move for summary judgment at an appropriate time.

*See generally* Joint Status Report of April 29, 2026, ECF 25 (No. 26-920). The Court consolidated the cases for purposes of this motion. ECF 29 (No. 26-920). NARA reserved the right to move for further consolidation at a later date. ECF 26-1 at 1 n.1 (No. 26-920).

## LEGAL STANDARD

On a FED. R. CIV. P. 12(b)(1) challenge to subject-matter jurisdiction, the plaintiff bears the burden of establishing jurisdiction "in the same way as any other matter on which the plaintiff bears the burden of proof." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). Thus, on a motion to dismiss, the complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). On a FED. R. CIV. P. 12(c) motion for judgment on the pleadings, the Rule 12(b) standards apply. *Massey v. Ojanit*, 759 F.3d 343, 347 (4th Cir. 2014).

**ARGUMENT**

**THE PRA DISPLACES FOIA'S RESPONSE DEADLINES**

I.     **The Text and Structure of the PRA Confirm that Its Notice Deadline Supersedes FOIA's Statutory Timeframe**

Plaintiffs seek records under the PRA. While the PRA uses FOIA as a procedural vehicle, both laws' provisions must be read in context so that the statutory scheme makes sense. FOIA's procedural framework cannot neuter the PRA's presidential notice rules, which provide a minimum 60-working-day (extendable to 90) Presidential notice period. Because the Court cannot apply FOIA's 20-working-day response deadline to the PRA without neutering those notice rules, the deadline does not apply, and Plaintiffs have prematurely filed suit. Bedrock principles of statutory construction confirm this Court lacks jurisdiction.

*First*, the PRA's privilege review process is part of a broader legislative scheme, and forcing NARA to choose between the President's notice period and administrative exhaustion would nullify the statutory protections for executive privilege. "Statutes should be interpreted 'as a symmetrical and coherent regulatory scheme,'" *Mellouli v. Lynch*, 575 U.S. 798, 809-10 (2015) (citation omitted), and courts should "give effect, if possible, to every word Congress used." *National Ass'n of Mfrs. v. Department of Defense*, 583 U.S. 109, 128-29 (2018) (citation omitted). Put differently, because "Congress presumably does not enact useless laws," courts "hesitate to adopt an interpretation that would eviscerate such significant aspects of the statutory text." *Garland v. Cargill*, 602 U.S. 406, 427 (2024) (citation omitted) (first quote); *American Hosp. Ass'n v. Becerra*, 596 U.S. 724, 737 (2022) (second quote). In 2014, Congress enacted § 2208's privilege procedures knowing full well what deadlines FOIA set. If its intent was to allow lawsuits after 20 working days, it would make no sense to give the President up to 90 working days to assert privilege. Conversely, if its intent was to abrogate the doctrine of administrative

exhaustion for public-access FOIA requests by layering a 90-working-day review period on a 20-working-day deadline, there were more straightforward ways to do that. *See Niz-Chavez v. Garland*, 593 U.S. 155, 167 (2021) ("[I]f that's what Congress meant, this was surely an awkward way of saying so."); *Biden v. Texas*, 597 U.S. 785, 798 (2022) (same).

*Second*, the specific prevails over the general. The PRA covers a specific subset of record requests. The fact that it uses FOIA as a procedural vehicle does not mean every part of FOIA applies. When two statutes conflict, "a specific statute closely applicable to the substance of the controversy at hand controls over a more generalized provision." *Farmer v. Employment Sec. Comm'n of N.C.,* 4 F.3d 1274, 1284 (4th Cir. 1993); *see also Morton v. Mancari*, 417 U.S. 535, 550-51 (1974) ("[W]here there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment."). The specific notice period available to Presidents under the PRA should prevail over the general response timeline of FOIA.

*Third*, the current presidential notice period under the PRA was enacted in 2014, decades after FOIA.  Under the last-in-time rule, "the more recent of two conflicting statutes shall prevail." *United States v. Under Seal*, 709 F.3d 257, 262 n.2 (4th Cir. 2013) (noting that when one statute was enacted in 1996 and the other was enacted in 2006, the later one should control). Congress knew what FOIA said when it enacted the PRA. *Cf. Everytown for Gun Safety Support Fund v. Bureau of ATF*, 984 F.3d 30, 34 (2d Cir. 2020) (when Congress passed a law preventing disclosure of specific materials notwithstanding FOIA, then passed the OPEN FOIA Act to impose additional procedural requirements on anti-disclosure laws, and then two months later renewed its anti-disclosure law with the same language as before, the more recent anti-disclosure law controlled over the contrary terms of the OPEN FOIA Act). When Congress enacted a more

8

specific and irreconcilable law on an overlapping topic, it did so on the natural understanding that the new law would displace FOIA.

*Fourth*, the Supreme Court already clarified that the interpretation of the very FOIA response deadline at issue is governed by common sense. In *Kissinger v. Reporters Committee for Freedom of the Press*, 445 U.S. 136 (1980), the plaintiff FOIA requesters argued that their requests imposed a duty on the agency (there, the State Department) to sue to recover records that would have been responsive to the FOIA request, but for the fact that a former Secretary of State had removed them from the agency before leaving office. *Id.* at 144-45, 152-53. The Supreme Court disagreed. It said the plaintiffs' position was so impractical that Congress could not have intended FOIA to function (or really, to not function) in that way. Pointing to the agency's then-applicable 10-working-day deadline to respond to FOIA requests, the Court explained that lawsuits could not be "waged and won in 10 days." *Id.* at 153. It declined to interpret FOIA in a way that would require the agency to do the impossible, instead concluding that Congress must have been "operating under the assumption that agencies would not be obligated to file lawsuits in order to comply with FOIA requests." *Id.* Here, Plaintiffs also interpret the PRA in a way that would require NARA to do the impossible. *Kissinger* rules out that kind of formalism for formalism's sake.

The PRA confirms a longstanding presidential notice timeframe that was codified long after FOIA. That timeframe overrides FOIA's short-fuse deadline, which interferes with each of these PRA goals. The PRA's text and structure confirm that Congress never intended to apply that deadline to the PRA. And because the PRA does not incorporate that FOIA deadline, it also does not incorporate FOIA's constructive-exhaustion penalty for missing that deadline.

9

II.     **The PRA's Drafting, Legislative, and Implementation History Uniformly Confirm that Congress Never Intended FOIA's Response Deadline to Apply to the PRA**

    A.     **Congress Knew It Needed to Balance Disclosure Against the Privilege Interests of Both Incumbent and Former Presidents**

Incumbent presidents may exercise constitutionally-based privileges to fulfill their constitutional duties, and former presidents may assert these privileges even after leaving office. The Supreme Court affirmed this principle in *Nixon v. Administrator of General Services (Nixon v. GSA)*, 433 U.S. 425 (1977), handed down one and a half years before the PRA became law. There, former President Nixon challenged the legality of the Presidential Recordings and Materials Preservation Act (PRMPA). *Id.* at 439. The Court "reject[ed] the argument that only an incumbent President may assert [executive privilege] claims," and held that former President Nixon could also assert the privilege. *Id.* The Court decided that the "confidentiality necessary to [the full and frank submissions of facts and opinions] cannot be measured by the few months or years between the submission of the information and the end of the President's tenure," and that "the privilege survives the individual President's tenure." *Id.* at 449.

The Court also recognized the Executive's role in establishing procedures to resolve privilege disputes *before* releasing records—including a notice period for privilege review. *See id.* at 441, 444 n.7. In disposing of former President Nixon's separation of powers challenge, the Court made the following points:

- Under the PRMPA, a presidential privilege review would precede any release of records. *Id.* at 444.

- To facilitate a meaningful privilege review, the PRMPA "require[d] *meaningful notice* to [former President Nixon] of archival decisions that might bring into play [his legally or constitutionally based rights or privileges]." *Id.* at 444 n.7 (emphasis added).

- Although GSA's proposed regulations for providing such "meaningful notice" for privilege claims were not before the Court, *id.* at 437-38, the Court recognized that GSA had issued a non-final regulation to give former President Nixon advance notice of any disclosure, *id.* at 444 n.7 (citing 41 C.F.R. § 105-63.205 (1976) [sic; should be § 105-63.206(e)]). GSA said President Nixon would receive "prior notice"; the regulation included no time limit. *See id.* In addition, GSA said the *incumbent* President's counsel was also entitled to prior notice "to examine these materials and raise any objections, defenses, or privileges to prevent or limit the proposed access." 41 C.F.R. § 105-63.206(d) (1976).

It was on this understanding that the Supreme Court upheld the PRMPA.

And it was against this backdrop of *both* former and incumbent presidents holding a stake in executive privilege that the PRA said, "Nothing in this Act shall be construed to confirm, limit, or expand any constitutionally-based privilege which may be available to an incumbent or former President." 44 U.S.C. § 2204(c)(2). Courts "normally assume that, when Congress enacts statutes, it is aware of relevant judicial precedent." *Ryan v. Gonzales*, 568 U.S. 57, 66 (2013) (citation omitted). And here, the House Report on the PRA specifically walked the reader through the relevant holding of *Nixon v. GSA*. *See* H.R. Rep. No. 95-1487, at 6-7 (1978).

### B.    Congress Never Intended to Link Executive Privilege with FOIA Deadlines

The privilege review process was never intended to overlap or otherwise operate in tandem with FOIA's short-fuse deadline. To the contrary, the PRA's legislative and drafting history shows that Congress expected the Executive Branch to establish the procedures for invoking and contesting the executive privilege; that Congress declined to micromanage what regulations the Executive would set; and that Congress did not intend to subject executive privilege disputes to the FOIA process.

Congress continually tinkered with the bill throughout the year 1978, until the very day before the bill passed. In so doing, it did not simply ignore the matter of Presidential privilege review. In fact, executive privilege was fairly controversial. The relevant House Committee initially refused to give the Executive regulatory authority to establish rules for a former President to review documents and invoke a constitutionally based privilege. In a series of last-minute adjustments to the PRA, the full Congress reversed course and gave the Executive that power.

Late in the drafting process, Congress added the modern-day 44 U.S.C. § 2206(3), which directed NARA to promulgate regulations to provide "notice … to the former President when the disclosure of particular documents may adversely affect any rights and privileges which the former President may have." *See* Presidential Records Act of 1978, 124  Cong. Rec. H34892, 34893 (Oct. 10, 1978). The earlier version reported out of committee had not contained this language. *See* H.R. Rep. No. 95-1487, at 17 (1978) (confirming that at the time, "no requirement of formal notice or consultation with the former President has been included"). Four days before the PRA passed, its drafters chose one of their own to explain the new language. Rep. Preyer confirmed that there would be an executive privilege review process and that the new subsection was meant to facilitate that process. As he put it, "prior to release of [potentially privileged] documents, the Archivist will provide notice to the former President pursuant to regulations promulgated under the act and the former President could then, insofar as constitutionally permitted, assert any privilege in the judicial forum provided by the bill to challenge the intended disclosure." 124 Cong. Rec  at H34895.

Notably, Rep. Preyer said this at a time when the bill did not even contain the § 2204(c)(2) privilege provision. *See id.* at H34893. The Senate added that language three days later. On the floor, Rep. Preyer said that the bill was "intended neither to limit nor to expand any constitutionally

based privilege." *Id.* at H34895. The Senate codified his opinion into statutory text, creating the modern-day § 2204(c)(2). "Preservation of and Public Access to Official Records of the President," 124 Cong. Rec. S36843, 36843 (Oct. 13, 1978) (Senate text); Presidential Records Act of 1978, 124 Cong. Rec. H38283, 38284 (Oct. 14, 1978) (House sponsor noting that the Senate language was drawn from Rep. Preyer's floor statement). Senator Percy, who introduced the amendment, said that the White House had agreed to the amendment and that Congress "cannot prevent a former or incumbent President from arguing … that a particular confidential communication" was privileged. *Id.* at S36844. The House accepted that amendment the next day. *Id.* at H38284.

One month later, President Carter echoed Rep. Preyer's assessment that the PRA did not displace the established doctrine of executive privilege. His signing statement confirmed the common understanding that the PRA would "provide[] for the resolution of constitutional questions raised by disputes over the release of Presidential records." *Statement on Signing H.R. 13500 Into Law* (Nov. 6, 1978).

### C. To Accommodate the Presidents' Privilege Interests, the PRA's Timeline Plainly Overrides FOIA's Deadline

After the Supreme Court and Congress acknowledged that both incumbent and former Presidents held a stake in executive privilege, the natural follow-up question was how to apply that privilege in practice. Day-one practice informs how the enactors of a law understood it to work. *Alden v. Maine*, 527 U.S. 706, 743-44 (1999) (citing *Printz v. United States*, 521 U.S. 898, 905 (1997)). Similarly, historical practice informs how institutions view themselves in relation to each other. "In separation-of-powers cases [the Supreme] Court has often 'put significant weight upon historical practice.'" *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 23 (2015) (quoting *NLRB v. Noel Canning*, 573 U.S. 513, 524 (2014)) (emphasis removed in *Zivotofsky*).

13

From 1978 to 2014, Congress left it to the Executive Branch to establish procedural rules for incumbent and former Presidents to raise executive privilege. *See supra* § II.B; H.R. Rep. No. 113-127, at 5; S. Rep. No. 113-218 at 4 (2014). And the Executive Branch has never understood the PRA to require NARA to respond to PRA requests within the generic FOIA response deadline. The Executive has always granted itself a review period longer than FOIA's. This day-one practice was initially guided by executive orders that mandated notice periods (usually 30 calendar days) before NARA could release potentially privileged documents. Congress adopted and ratified this practice when it amended the PRA in 2014 to codify the notice period and to extend it to 60 *working* days. S. Rep. No. 113-218 at 8.

At the end of his second term, President Reagan (the first president subject to the PRA) issued Executive Order (EO) 12667, 54 Fed. Reg. 3403 (Jan. 18, 1989), to govern how he and his successors would review privilege disputes. Section 2(b) of the EO gave incumbent and former Presidents a 30-day notice period.[3] This alone was over twice as long as the ten-working-day FOIA response deadline in force at the time. *See* 5 U.S.C. § 552(a)(6)(A)(i) (1988). Even if NARA granted itself a ten-working-day extension under § 552(a)(6)(B), it could not comply. Also, the incumbent President was not required to *complete* her review of documents within 30 days; she could simply tell the Archivist "to extend the time period." EO § 2(b); *see also id.* § 3 (imposing no further time limits on privilege review for incumbent Presidents). Finally, the former President was entitled to an additional 30-day notice period if NARA or the incumbent President declined to uphold her privilege determination, so she could seek injunctive relief. *Id.* § 4(b).

---

[3] The Reagan EO included a small exception allowing NARA to shorten the presidential notice period in special-access cases (e.g., Congress and courts) under 36 C.F.R. § 1270.44. Congress put a similar exception in 44 U.S.C. § 2208(e). Neither exception applies to this public-access case.

14

The Government has followed this approach to this day. The privilege review period converged, but did not cross into, the FOIA deadline in 1997, when Congress extended the response period for generic FOIA requests from 10 to 20 working days. *See* Electronic FOIA Amendments of 1996 §§ 8(b), 12(b), Pub. L. No. 104-231, 110 Stat. 3048, 3052, 3054 (Oct. 2, 1996) (effective Oct. 2, 1997). Following those amendments, compliance with both the FOIA deadline and the Reagan EO notice period was technically in the realm of possibility, provided that NARA granted itself a ten-working-day extension *and* the incumbent and former Presidents both declined to invoke the privilege. However, the Reagan EO gave NARA no discretion to deny an incumbent President an extension.

Any surface-level resemblance to FOIA disappeared in 2001, when President Bush replaced the Reagan EO with Executive Order 13233, 66 Fed. Reg. 56025 (Nov. 1, 2001). The Bush EO imposed no deadline on former Presidents to review documents for privilege, saying only that "requests that are not unduly burdensome" should be reviewed within 90 days. EO § 3(b). Under the Bush EO, the incumbent President could independently review the records in question, either "[c]oncurrent with or after the former President's review," and again with no time limit. *Id.* § 3(d). The former President could block documents from being released even if the incumbent President disagreed. *Id.* § 3(d)(1)(ii). The Senate Report on the 2014 amendments noted that before President Bush issued the EO, his counsel had asked NARA for several extensions of the review period in connection with requests for Reagan Administration files. *See* S. Rep. No. 113-218 at 3.

President Obama "effectively restored" the Reagan EO's 30-day review period (and its 30-day period to file suit) in Executive Order 13489 § 2(b), 74 Fed. Reg. 4669 (Jan. 21, 2009). H.R. Rep. No. 113-127 at 5 n.8. This governed privilege disputes until Congress enacted a statutory privilege framework in 2014.

15

**D.      Instead of Questioning This Practice, Congress Formalized It**

Congress' conduct over the last half-century confirms that the PRA has never required NARA to respond to PRA requests within the generic FOIA response deadline. This began with a quarter-century of Congressional acquiescence to Presidential practice. If there was still any doubt about whether the PRA incorporated FOIA's response deadline, Congress removed it when it amended the PRA in 2014.

The House Report for the 2014 amendments recognized the long history of executive practice and sought to displace it—but in a way that *sharpened* the PRA's clash with FOIA. The committee explained that the purpose of the law was to "codify an executive order to fill an executive privilege related gap in the [PRA] while also streamlining outdated statutory recordkeeping language and making additional changes to improve the federal government's ability to capture and archive electronic records." H.R. Rep. No. 113-127 at 4; *see also id.* at 5 (proclaiming that the new statutory procedure was "effectively in accord with the Reagan and Obama Administration frameworks"); S. Rep. No. 113-218 at 4 ("This is the same approach followed in President Reagan's Executive Order on the PRA."). The Senate Report put it more bluntly: absent a Congressional enactment, "each successive President likely will issue his or her own executive order interpreting the original PRA." *Id*. at 3. The result was that the presidential notice period grew from 30 calendar days to 60 *working* days.

It's hard to imagine *stronger* historical evidence to apply the plain statutory text.

* * *

"Legislation is … the art of compromise." *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 89 (2017). "[T]he limitations expressed in statutory terms [are] often the price of passage, and no statute yet known 'pursues its [stated] purpose [ ] at all costs.'" *Id.* (citation omitted).

16

Disclosure is doubtless *one* goal of the PRA, 44 U.S.C. § 2203(g)(1), but it is one of several. The PRA aims to balance the broader goal of disclosure with constitutionally grounded concerns about Executive Branch deliberation, stakeholder comments, and multiple layers of review.

Given the PRA's text and history, there is no reason to read the PRA in precise lockstep with FOIA. The two laws were passed in different contexts and reflect different Congressional priorities. FOIA's constructive-exhaustion rule impels agencies to process requests faster. Powerful as that may be, FOIA's short-fuse deadline would cut an ugly gash through the deliberative process Congress established in the PRA. The only plausible reading is that it does not apply to the PRA.

"Congress generally 'intend[s] the full consequences of what it sa[ys]'—even if 'inconvenient, costly, and inefficient.'" *Thacker v. TVA*, 587 U.S. 218, 224 (2019) (citation omitted). "[R]easonable people can disagree with how Congress balanced the various social costs and benefits," *Henson*, 582 U.S. at 90, but "[d]eciding what competing values will or will not be sacrificed to the achievement of a particular objective is the very essence of legislative choice— and it frustrates rather than effectuates legislative intent simplistically to assume that *whatever* furthers the statute's primary objective must be the law," *Rodriguez v. United States*, 480 U.S. 522, 526 (1987). The PRA's text is straightforward and compels an equally straightforward result. Plaintiffs sued too early, and their records-denial counts must be dismissed.

## CONCLUSION

In Case No. 26-371, the Court should dismiss Counts 2, 4, 6, and 8-12.

In Case No. 26-847, the Court should dismiss the case.

In Case No. 26-920, the Court should dismiss the case.

In Case No. 26-1214, the Court should dismiss Counts 1 and 3-6.

Dated: May 26, 2026                     Respectfully submitted,

                                        BRETT A. SHUMATE
                                        Assistant Attorney General, Civil Division

                                        ELIZABETH J. SHAPIRO
                                        Deputy Director, Federal Programs Branch

                                        */s/ Winston Shi*
                                        JOHN BAILEY (OH Bar No. 104260)
                                        Counsel to the Assistant Attorney General
                                        WINSTON SHI (NY Bar No. 5747068)
                                        Trial Attorney
                                        U.S. Department of Justice
                                        Civil Division, Federal Programs Branch
                                        1100 L Street NW
                                        Washington, DC 20005
                                        Phone: (202) 880-0387
                                        Email: winston.g.shi@usdoj.gov

                                        *Counsel for Defendant*

18