**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Southern Division)**

| | |
|---|---|
| LEGAL EAGLE, LLC, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>NATIONAL ARCHIVES AND RECORDS ADMINISTRATION, *et al.*,<br><br>Defendants. | No. 8:26-cv-371-TDC<br>No. 8:26-cv-847-TDC<br>No. 8:26-cv-920-TDC<br>No. 8:26-cv-1214-TDC |

**MEMORANDUM IN SUPPORT OF PARTIAL MOTION TO DISMISS AND FOR JUDGMENT ON THE PLEADINGS**

# TABLE OF CONTENTS


INTRODUCTION ........ 1

BACKGROUND ........ 2

I. Statutory Background for Public-Access Records Requests ........ 2

A. A Document Cannot Be Both a Presidential and a Federal Record ........ 2

B. The Life Cycle of a Typical FOIA Request ........ 3

C. Special Procedures in PRA Cases ........ 4

II. Civil Litigation to Recover Federal Records in Third-Party Hands ........ 7

III. Factual Background ........ 7

A. Plaintiffs' PRA Requests ........ 7

B. The Mar-a-Lago Records (Case No. 26-920) ........ 8

IV. Procedural History and Plaintiffs' Claims ........ 9

LEGAL STANDARD ........ 10

ARGUMENT ........ 11

I. The PRA Displaces FOIA's Response Deadlines, and Plaintiffs Have Largely Failed to Exhaust Administrative Remedies for Their PRA Requests ........ 11

A. The Text and Structure of the PRA Confirm that Its Notice Deadline Supersedes FOIA's Statutory Timeframe ........ 11

B. The PRA's Drafting, Legislative, and Implementation History Uniformly Confirm that Congress Never Intended FOIA's Deadline to Apply to the PRA ........ 14

1. Congress Attempted to Balance Disclosure Against the Privilege Interests of Both Incumbent and Former Presidents ........ 14

2. Congress Never Linked Executive Privilege to FOIA Deadlines ........ 15

3. The PRA's Timeline Overrides FOIA's Deadline in an Effort to Accommodate the Presidents' Privilege Interests ........ 17

4. Instead of Questioning This Practice, Congress Formalized It ........ 19

C. The Court Should Reject Plaintiffs' Naked Policy Rationale ........ 20

II. NARA Is Not Required to Ask DOJ to "Initiate Action" Under the PRA (Counts 3-4, Case No. 26-920) ..... 21

A. NARA's Authority to Ask DOJ to "Initiate Action" to Recover Presidential Records Is Committed to Agency Discretion ..... 22

1. The PRA Itself Imposes No Duty to Seize Presidential Records ..... 22

2. The Source of NARA's Authority to Initiate Litigation to Recover Presidential Records Does Not Impose a *Duty* to Litigate ..... 23

B. Plaintiffs' Injuries Are Not Redressable by a Favorable Judicial Decision..... 26

C. If the President Designated Trump 1 Records as Personal Records While in Office, the Court May Not Review that Designation ..... 27

III. Private Plaintiffs Lack Both Standing and a Statutory Basis to Challenge Which Federal Agency Houses Presidential Records (Counts 5-6, Case No. 26-920)..... 28

A. Plaintiffs' Informational Injury Does Not Permit Them to Sue Under the APA or Mandamus Act to Transfer Records from the FBI to NARA..... 28

B. Plaintiffs May Not Short-Circuit the PRA's Administrative Enforcement Scheme by Asking the Court to Enjoin the FBI Directly ..... 30

CONCLUSION..... 30

## TABLE OF AUTHORITIES

**Cases**

*AFSCME v. SSA*,
771 F. Supp. 3d 717 (D. Md. 2025) .......... 29

*Alden v. Maine*,
527 U.S. 706 (1999) .......... 17

*American Hist. Ass'n v. NARA*,
516 F. Supp. 2d 90 (D.D.C. 2007) .......... 19

*American Historical Ass'n v. Trump*,
2026 WL 1412395 (D.D.C. May 20, 2026) .......... 23

*American Hosp. Ass'n v. Becerra*,
596 U.S. 724 (2022) .......... 11

*Armstrong v. Bush (Armstrong I)*,
924 F.2d 282 (D.C. Cir. 1991) .......... 28, 30

*Armstrong v. Executive Office of the President (Armstrong II)*,
1 F.3d 1274 (D.C. Cir. 1993) .......... 2, 28

*Armstrong v. Executive Office of the President (Armstrong III)*,
90 F.3d 553 (D.C. Cir. 1996) .......... 2

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .......... 10

*Biden v. Texas*,
597 U.S. 785 (2022) .......... 12

*City of N.Y. v. U.S. Dep't of Def.*,
913 F.3d 423 (4th Cir. 2019) .......... 22, 29

*Claybrook v. Slater*,
111 F.3d 904 (D.C. Cir. 1997) .......... 25

*Corner Post, Inc. v. Bd. of Governors of Fed. Reserve Sys.*,
603 U.S. 799 (2024) .......... 23

*Cotton v. United States*,
52 U.S. (11 How.) 229 (1850) .......... 25

*dmarcian Inc. v. DMARC Advisor BV*,
182 F.4th 289 (4th Cir. 2026) .......... 26

*Elec. Priv. Info. Ctr. v. IRS*,
910 F.3d 1232 .......... 29

*Everytown for Gun Safety Support Fund v. Bureau of ATF*,
984 F.3d 30 (2d Cir. 2020) .......... 12

*Farmer v. Emp. Sec. Comm'n of N.C.*,
4 F.3d 1274 (4th Cir. 1993) .......... 12

*Feinman v. FBI*,
713 F. Supp. 2d 70 (D.D.C. 2010) .......... 30

*Garland v. Cargill*,
602 U.S. 406 (2024) .......... 11

*Haaland v. Brackeen*,
599 U.S. 255 (2023) .......... 26

*Heckler v. Chaney*,
470 U.S. 821 (1985) .......... 25

*Henson v. Santander Consumer USA Inc.*,
582 U.S. 79 (2017) .......... 20

*Humane Soc. of the U.S. v. U.S. Fish & Wildlife Serv.*,
838 F. App'x 721 (4th Cir. 2020) .......... 29

*In re First Fed. Sav. & Loan Ass'n of Durham*,
860 F.2d 135 (4th Cir. 1988) .......... 29

*Judicial Watch, Inc. v. NARA*,
845 F. Supp. 2d 288 (D.D.C. 2012) .......... *passim*

*Kissinger v. Reporters Comm. for Freedom of the Press*
445 U.S. 136 (1980) .......... 5, 13

*Lopez v. Davis*,
531 U.S. 230 (2001) .......... 25

*Lovo v. Miller*,
107 F.4th 199 (4th Cir. 2024) .......... 22

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) .......... 10, 27

*Massey v. Ojaniit*,
759 F.3d 343 (4th Cir. 2014) .......... 10

*McKenzie-El v. IRS*,
2020 WL 902546 (D. Md. Feb. 24, 2020) .......... 30

*Mellouli v. Lynch*,
575 U.S. 798 (2015) .......... 11

*Meyer v. Bush*,
981 F.2d 1288 (D.C. Cir. 1993) ........................................ 4

*Morton v. Mancari*,
417 U.S. 535 (1974) ........................................ 12

*Murray Energy Corp. v. Adm'r of EPA*,
861 F.3d 529 (4th Cir. 2017) ........................................ 22

*National Ass'n of Mfrs. v. Dep't of Def.*,
583 U.S. 109 (2018) ........................................ 11

*National Family Planning & Repro. Health Ass'n, Inc. v. Gonzales*,
468 F.3d 826 (D.C. Cir. 2006) ........................................ 29

*Nixon v. Administrator of General Services*,
433 U.S. 425 (1977) ........................................ 14, 15

*Niz-Chavez v. Garland*,
593 U.S. 155 (2021) ........................................ 12

*NLRB v. Noel Canning*,
573 U.S. 513 (2014) ........................................ 17

*Norton v. S. Utah Wilderness All.*,
542 U.S. 55 (2004) ........................................ 22

*Pollack v. DOJ*,
49 F.3d 115 (4th Cir. 1995) ........................................ 4

*Polselli v. IRS*,
598 U.S. 432 (2023) ........................................ 23

*Printz v. United States*,
521 U.S. 898 (1997) ........................................ 17

*Public Citizen v. Carlin*,
184 F.3d 900 (D.C. Cir. 1999) ........................................ 3

*Rodriguez v. United States*,
480 U.S. 522 (1987) ........................................ 20

*Rotkiske v. Klemm*,
589 U.S. 8 (2019) ........................................ 23

*Ryan v. Gonzales*,
568 U.S. 57 (2013) ........................................ 15

*Seumanu v. Dep't of Navy*,
2025 WL 2986806 (D. Md. Oct. 23, 2025) ........................................ 30

*Thacker v. TVA*,
587 U.S. 218 (2019) ........................................................................................ 21

*Town of Castle Rock v. Gonzales*,
545 U.S. 748 (2005) ........................................................................................ 26

*United States v. Moffitt, Zwerling & Kemler, P.C.*,
83 F.3d 660 (4th Cir. 1996) ........................................................................ 24, 25

*United States v. Navarro*,
664 F. Supp. 3d 48 (D.D.C. 2023) ........................................................ 22, 24, 26

*United States v. Navarro*,
2024 WL 1364354 (D.C. Cir. Apr. 1, 2024) .................................................. 25

*United States v. T.M.*,
413 F.3d 420 (4th Cir. 2005) ........................................................................ 25

*United States v. Under Seal*,
709 F.3d 257 (4th Cir. 2013) ........................................................................ 12

*Westcott v. McHugh*,
39 F. Supp. 3d 21 (D.D.C. 2014) .................................................................. 29

*Zivotofsky ex rel. Zivotofsky v. Kerry*,
576 U.S. 1 (2015) ........................................................................................ 17

**Statutes**

5 U.S.C. § 552 ................................................................................ 3, 4, 18

5 U.S.C. § 704 ........................................................................................ 29

5 U.S.C. § 706 ........................................................................................ 22

28 U.S.C. § 516 ...................................................................................... 26

44 U.S.C. § 395 ........................................................................................ 7

44 U.S.C. § 396 ........................................................................................ 7

44 U.S.C. § 2101 ................................................................................ 3, 24

44 U.S.C. § 2112 ........................................................................ 21, 24, 30

44 U.S.C. § 2201 ...................................................................... 2, 3, 5, 27

44 U.S.C. § 2202 .................................................................................... 28

44 U.S.C. § 2203 ............................................................................ *passim*

44 U.S.C. § 2204 ........ *passim*

44 U.S.C. § 2206 ........ 5, 16

44 U.S.C. § 2208 ........ 6

44 U.S.C. § 2905 ........ 7, 26, 30

44 U.S.C. § 3101 ........ 3

44 U.S.C. § 3301 ........ 3

44 U.S.C. § 3106 ........ 7, 26

D.C. Code § 16-3702 ........ 24

FRA, Pub. L. No. 81-754, 64 Stat. 578, 578-91 (1950),
*codified at* 44 U.S.C. § 2101 *et seq.* ........ 3, 7

PRA, Pub. L. No. 95-591, 92 Stat. 2523, 2523-28 (1978),
*codified at* 44 U.S.C. § 2201 *et seq.* ........ 2, 25

Pub. L. No. 104-231, 110 Stat. 3048, 3052, 3054 (1996) ........ 18

The Presidential and Federal Records Act Amendments of 2014,
Pub. L. No. 113-187, 128 Stat. 2003, 2003-15 (2014) ........ 6

**Rules**

Fed. R. Civ. P. 12 ........ 10

**Executive Materials**

36 C.F.R. § 1250.26 ........ 6

36 C.F.R. § 1250.28 ........ 4

36 C.F.R. § 1250.72 ........ 4

36 C.F.R. § 1270.38 ........ 3

41 C.F.R. § 105-63.205 (1976) ........ 15

41 C.F.R. § 105-63.206 (1976) ........ 15

54 Fed. Reg. 3403 (Jan. 18, 1989) ........ 18

66 Fed. Reg. 56025 (Nov. 1, 2001) ........ 18, 19

74 Fed. Re g. 4669 (Jan. 21, 2009) ........................................................................ 19, 20

79 Fed. Reg. 56500, 56508 (Sep. 22, 2014) ................................................................... 6

82 Fed. Reg. 8901, 8902 (Feb. 1, 2017) ........................................................................ 6


**Other Authorities**


H.R. Conf. Rep. No. 93-1380 (1974)........................................................................... 5

H.R. Rep. No. 95-1487 (Aug. 14, 1978)...................................................................5, 15, 16

H.R. Rep. No. 113-127 (June 25, 2013) ................................................................ *5, 17, 19*

Letter from Kathleen Dillon McClure to David Warrington (July 23, 2026),
archives.gov/files/foia/pra-notifications/pdf/trump45/rn-pldjt-2026-099.pdf
[perma.cc/99RZ-DRVQ] ..................................................................................8

"Preservation of and Public Access to Official Records of the President,"
124 Cong. Rec. S36843 (Oct. 13, 1978).......................................................... 16, 17

Presidential Records Act of 1978, 124 Cong. Rec. H34892 (Oct. 10, 1978) ............................ 16

Presidential Records Act of 1978, 124 Cong. Rec. H38283 (Oct. 14, 1978) ............................. 16

S. Rep. No. 113-218 (2014) ...........................................................................17, 18, 19, 20

Statement on Signing H.R. 13500 Into Law (Nov. 6, 1978)................................................. 17

## INTRODUCTION

The Presidential Records Act (PRA) and Federal Records Act (FRA) regulate two separate sets of records in sharply different ways. A record can be only presidential or federal—never both. The public can file Freedom of Information Act (FOIA) requests for both types of records, but the similarities end there. Plaintiffs' four complaints assume the PRA operates just like the FRA. But Congress drafted the Acts differently for a reason.

Plaintiffs' first challenge is based on FOIA, and urges the Court to treat presidential records as though they were federal records. FOIA's administrative-exhaustion rule lets plaintiffs sue to enforce FOIA requests for federal records after 20 working days. But compared to federal records, the PRA restricts public access to presidential records, overlaying several layers of agency and presidential review on top of FOIA. One of these layers—the 60 working days the PRA gives current and former Presidents to review proposed disclosures for executive privilege—necessarily displaces FOIA's 20-day deadline. Since constructive exhaustion under FOIA occurs only if the agency breaches an applicable deadline, Plaintiffs have failed to exhaust administrative remedies, and most of their records-access claims fail at the very start. Plaintiffs fall back on policy arguments, urging that the sky is falling because the National Archives and Records Administration (NARA) will never review their requests without the threat of a FOIA suit. But NARA is processing Plaintiffs' requests right now. In fact, it has already sent the White House the first tranche of responsive records for a privilege review. So this argument lacks merit.

Plaintiffs' second challenge is based directly on the FRA, and urges the Court to read part of the FRA into the PRA. The FRA directs NARA to ask the Department of Justice (DOJ) to "initiate action" to recover federal records that were removed from agency custody. But the PRA does not impose a like requirement for presidential records. Courts have repeatedly confirmed this.

Plaintiffs want DOJ to file a civil suit to recover alleged presidential records so Plaintiffs can submit records requests for them. But while NARA *can* refer the case to DOJ, nothing in the PRA *requires* it to do so. Separately, the Court may not review any designation of records as personal records that President Trump may have made while in office.

Finally, Plaintiffs' third challenge urges the Court to compel the Federal Bureau of Investigation (FBI) to send NARA other alleged presidential records in its possession. But the PRA's referral procedure is the exclusive vehicle to move a record to NARA. In any case, unless Plaintiffs obtain confirmation that the FBI will not process a FOIA request for presidential records in its possession, Plaintiffs may not sue under the APA to move records from one office to another.

## BACKGROUND

### I. Statutory Background for Public-Access Records Requests

#### A. A Document Cannot Be Both a Presidential and a Federal Record

Executive Branch records are governed by two statutes: the PRA and the FRA. "[N]o record is subject to both the FRA and the PRA: The FRA describes a class of materials that are federal records subject to its provisions, and the PRA describes another, mutually exclusive set of materials that are subject to a different and less rigorous regime." *Armstrong v. Executive Office of the President (Armstrong III)*, 90 F.3d 553, 556 (D.C. Cir. 1996) (simplified). "In other words, no individual record can be subject to both statutes because their provisions are inconsistent." *Armstrong v. Executive Office of the President (Armstrong II)*, 1 F.3d 1274, 1293 (D.C. Cir. 1993).

Under the PRA, Pub. L. No. 95-591, 92 Stat. 2523, 2523-28 (1978), *codified at* 44 U.S.C. § 2201 *et seq.*, NARA is "responsib[le] for the custody, control, and preservation of, and access to," former Presidents' records, and assumes custody of an Administration's presidential records after the respective President leaves office. 44 U.S.C. § 2203(g)(1). Presidential records are

defined as "documentary materials, or any reasonably segregable portion thereof, created or received by the President, the President's immediate staff, or a unit or individual of the Executive Office of the President whose function is to advise or assist the President, in the course of conducting activities which relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President." *Id.* § 2201(2). Five years after an administration ends, the public may request that administration's Presidential records through FOIA. *Id.* § 2204(c)(1); 36 C.F.R. § 1270.38. The Trump Presidential Library, a NARA component, houses records from the first Trump Administration (Trump 1). *Cf.* 44 U.S.C. § 2203(g)(2).

The FRA, Pub. L. No. 81-754, 64 Stat. 578, 578-91 (1950), *codified at* 44 U.S.C. § 2101 *et seq.*, is "a collection of statutes governing the creation, management, and disposal of records by federal agencies." *Public Citizen v. Carlin*, 184 F.3d 900, 902 (D.C. Cir. 1999). Federal records are defined as "all recorded information, regardless of form or characteristics, made or received by a Federal agency under Federal law or in connection with the transaction of public business and preserved or appropriate for preservation by that agency … as evidence of the organization, functions, policies, decisions, procedures, operations, or other activities of the United States Government or because of the informational value of data in them[.]" 44 U.S.C. § 3301(1)(A). The FRA directs federal agency heads to "make and preserve records containing adequate and proper documentation of the organization, functions, policies, decisions, procedures, and essential transactions of the agency[.]" *Id.* § 3101.

**B. The Life Cycle of a Typical FOIA Request**

The Freedom of Information Act allows the public to request the records of an "agency." 5 U.S.C. § 552(a)(3). "[A] requester may generally seek judicial review of his FOIA request only

after he has exhausted all administrative remedies." *Pollack v. DOJ*, 49 F.3d 115, 118 (4th Cir. 1995). To begin, a FOIA requester files her request with the agency. In exceptional cases, a requester may ask for expedited processing upon a showing of a "compelling need," or "in other cases determined by the agency." 5 U.S.C. § 552(a)(6)(E)(i), (v); *see also* 36 C.F.R. § 1250.28(a) (NARA's four criteria, two of which are from the FOIA statute). Expedited processing moves the request to the front of the agency queue. If the agency grants expedited processing, it must process the request "as soon as practicable." 5 U.S.C. § 552(a)(6)(E)(iii).

Absent a grant of expedited processing, the agency ordinarily must respond within 20 working days. *Id.* § 552(a)(6)(A)(i). An agency may grant itself a one-time extension of 10 working days. *Id.* § 552(a)(6)(B)(i). If the agency fails to respond within that timeframe, FOIA constructively exhausts the requester's administrative remedies. *Id.* § 552(a)(6)(C)(i).

After the agency responds, the requester may file an administrative appeal. (NARA gives requesters 90 calendar days to appeal. 36 C.F.R. § 1250.72(a).) The agency must process the appeal within 20 working days. Again, if the agency fails to respond within that timeframe, FOIA constructively exhausts administrative remedies. 5 U.S.C. § 552(a)(6)(A)(ii), (C)(i).

Unless a statutory exhaustion rule applies, requesters may not sue in district court until they have completed the administrative appeal process. *Pollack*, 49 F.3d at 118.

### C. Special Procedures in PRA Cases

The FOIA statute's use of the word "agency" maps onto the airtight separation between presidential and federal records. FOIA and the APA use the word "agency" differently. *Meyer v. Bush*, 981 F.2d 1288, 1291 n.1 (D.C. Cir. 1993). In 1974, Congress amended FOIA to codify the D.C. Circuit's *Soucie* test for Executive Branch components subject to FOIA. *See id.* at 1291 (tracing the legislative history). *Soucie* excluded from FOIA "the President's immediate personal

staff or units in the Executive Office [of the President] whose sole function is to advise and assist the President." *Kissinger v. Reporters Comm. for Freedom of the Press*, 445 U.S. 136, 156 (1980) (quoting H.R. Conf. Rep. No. 93-1380 at 15 (1974)). Four years later, Congress enacted the PRA, which adopted the *Soucie* test to define what entities generated presidential records. *See* 44 U.S.C. § 2201(2). The PRA also excluded federal records subject to FOIA from the definition of a presidential record. *Id.* § 2201(2)(B)(i). In plain English, without further legislation, presidential records would not be subject to FOIA at all. *See* Presidential Records Act of 1978 at 3, H.R. Rep. 95-1487 (Aug. 14, 1978) ("The intent is that all records which are neither agency records subject to FOIA nor personal records would fall within the ambit of Presidential records.").

The PRA nonetheless allows the public to file FOIA requests for presidential records, but subject to several limitations. The PRA makes NARA the custodian of past Administrations' presidential records, 44 U.S.C. § 2203(g)(1), and provides that for FOIA purposes, such records "shall be deemed to be [NARA] records," *id.* § 2204(c)(1). But Congress added that the PRA "shall" not be interpreted to "confirm, limit or expand any constitutionally-based privilege which may be available to an incumbent or former President." *Id.* § 2204(c)(2). To effectuate privilege review, the PRA has always required NARA to issue regulations giving former Presidents notice whenever NARA plans to release records from their respective administrations. *See id.* § 2206(3).

When it was enacted, the PRA did not itself specify the process for "former presidents to request continued restricted access to presidential records created during their respective administrations." *Presidential and Federal Records Act Amendments of 2013* [sic], H.R. Rep. No. 113-127, at 5 (June 25, 2013). "To fill this gap, several presidents since the passage of the PRA [] issued executive orders to formalize a request procedure and define the limits of such requests." *Id.* Those orders invariably gave incumbent and former Presidents a mandatory notice period to

review records for privilege before NARA could disclose them to the public. *See infra* Argument § I.B.3. As NARA has explained, "[w]e can provide the final response [to a FOIA request] only at the end of the Presidential notification period set forth in the Executive order." *See NARA Records Subject to FOIA*, 79 Fed. Reg. 56500, 56508 (Sep. 22, 2014), *codified at* 36 C.F.R. § 1250.26(j).

The Presidential and Federal Records Act Amendments of 2014, Pub. L. No. 113-187, 128 Stat. 2003, 2003-15 (2014), formalized the executive privilege review process by adding a new Section 2208 to Title 44. Under that law, whenever NARA proposes releasing presidential records to the public, it must first notify the incumbent and former Presidents and give them 60 working days to review the proposed disclosures for potential assertion of a constitutionally based privilege. *See* 44 U.S.C. § 2208(a)(3)(A). Either President may unilaterally grant herself a one-time, 30-working-day extension to conduct this review. *Id.* § 2208(a)(3)(B). NARA amended the PRA regulation after Section 2208 was enacted, but not the statement that NARA could not respond to a PRA request until it completed the presidential notification period first. *See NARA Records Subject to FOIA*, 82 Fed. Reg. 8901, 8902 (Feb. 1, 2017) (amending 36 C.F.R. § 1250.26(h) but not § 1250.26(j)). If a President chooses to make a privilege claim, there may be further delays for the incumbent President to evaluate the claim. *See* 44 U.S.C. § 2208(a)(3)(A), (c)(2)(C), (d)(2).

The privilege review period facilitates a separate PRA mechanism, which also requires a former President's involvement. The PRA allows a President to designate certain categories of records as restricted for up to 12 years after her term ends. 44 U.S.C. § 2204(a). Although the PRA restrictions overlap with the FOIA exceptions, PRA restrictions are not judicially reviewable if NARA upholds them; they are reviewable only if NARA declines to uphold a restriction and the former President challenges NARA's decision. *Id.* § 2204(b)(3), (e). NARA must consult with the former President before declining to uphold a restriction. *Id.* § 2204(b)(3).

## II. Civil Litigation to Recover Federal Records in Third-Party Hands

The original FRA contained two related packages of records management rules. The first, former 44 U.S.C. § 395, governed the General Services Administration (GSA), which oversaw the National Archives until 1984. 64 Stat. at 585-86. The second, former 44 U.S.C. § 396, governed other federal agencies. *Id.* at 586-87.

In Case No. 26-920, Plaintiffs invoke one of two related FRA provisions (the "redress statutes") that address how NARA and the heads of other agencies report and respond to allegations of wrongful retention, alteration, and/or destruction of federal records. *See* 44 U.S.C. §§ 2905(a), 3106. Plaintiffs' complaint relies on Section 2905(a), which identifies NARA's duties under the FRA. *See* FAC ¶¶ 37, 57-58, 64-65. Under that law,

> The Archivist shall notify the head of a Federal agency of any actual, impending, or threatened unlawful removal, defacing, alteration, or destruction of records in the custody of the agency that shall come to the Archivist's attention, and assist the head of the agency in initiating action through the Attorney General for the recovery of records unlawfully removed and for other redress provided by law. In any case in which the head of the agency does not initiate an action for such recovery or other redress within a reasonable period of time after being notified of any such unlawful action, the Archivist shall request the Attorney General to initiate such an action, and shall notify the Congress when such a request has been made.

## III. Factual Background

### A. Plaintiffs' PRA Requests

The PRA authorized the public to request Trump 1 records on January 20, 2026, five years after President Trump left office for the first time. *See* 44 U.S.C. § 2204(b)(2)(A). On January 20, Plaintiff National Security Counselors filed a series of PRA requests, which Plaintiff Legal Eagle later joined. NARA divided each request at issue in these lawsuits into requests for classified information (prefixed "NW") and unclassified information (prefixed with the year of the request). So divided, there are 22 requests at issue.

NARA is currently processing Plaintiffs' requests in the ordinary course:

*First,* NARA sent the White House Counsel's Office its first 60-day PRA privilege review notification on July 23, 2026. Its letter bundled several PRA requests, one of which—Request No. 26-30041-F—is at issue in this litigation. *See* Letter from Kathleen Dillon McClure to David Warrington (July 23, 2026), *available at* archives.gov/files/foia/pra-notifications/pdf/trump45/rn-pldjt-2026-099.pdf [perma.cc/99RZ-DRVQ]. In response to that specific PRA request, NARA proposes releasing 266 assets in whole and 24 assets in part. *See id.* at 6. Absent objection or an extension, NARA plans to release the records by October 26, 2026. *Id.* at 1.[1]

*Second*, NARA provided a full response to one of Plaintiffs' requests, for classified minutes of meetings of the Interagency Security Classification Appeals Panel (ISCAP). NARA found no responsive records. When Plaintiffs asked NARA to check again, NARA said its response was final. Plaintiffs administratively appealed that response. *See* Compl. ¶¶ 40-45 (No. 26-1214).

Plaintiffs also requested, and NARA timely denied, expedited processing of four requests related to the National Security Council's (NSC) pre-publication review of John Bolton's 2020 book *The Room Where It Happened*. *See* FAC ¶¶ 39, 47, 61, 69 (No. 26-371), ECF 6.[2]

**B. The Mar-a-Lago Records (Case No. 26-920)**

As alleged, after the end of President Trump's first term in office, the next administration negotiated with President Trump over Trump 1 records that President Trump kept at the Mar-a-Lago Club in Florida. *See* First Amended Complaint (FAC) ¶¶ 16-24 (No. 26-920). The negotiations mainly concerned classified records. *See id.* ¶¶ 16, 21, 24. Presidential records

[1] Request No. 26-30041-F is a subset of Request No. 26-19372-F, which Plaintiffs seek to enforce in Case No. 26-371. *See* First Amended Complaint ¶¶ 31-40, ECF 6.

[2] The original complaint in No. 26-371 was filed nine working days after the requests, and wrongly alleged that NARA missed the deadline. Compl. ¶¶ 38, 48. The FAC corrected this allegation.

are not the same as classified records. But Plaintiffs believe some of the Mar-a-Lago records were independently federal property by virtue of being presidential records. *See id.* ¶¶ 25, 29.

Before the FBI search, President Trump transferred certain records to NARA. *See* Declaration of Kate Dillon McClure ¶ 5, ECF 20-1.[3] On August 8, 2022, the FBI, a DOJ component, searched Mar-a-Lago and recovered additional records. FAC ¶ 26. The FBI kept physical custody of the records. *See id.* ¶ 27. NARA has never "obtained, accessed, or reviewed" records from the FBI search. McClure Decl. ¶ 6.

On or around February 28, 2025, the FBI transferred certain records from the 2022 search back to President Trump, who had recently started his second term in office. *See* FAC ¶¶ 28-30. Plaintiffs allege that the FRA's redress statutes require NARA to ask DOJ to "initiate action" to recover any presidential records DOJ (through the FBI) previously transferred to President Trump, and that the FBI independently must send NARA any remaining presidential records it recovered from Mar-a-Lago. *See id.* ¶¶ 52-78.

## IV. Procedural History and Plaintiffs' Claims

Plaintiffs filed four lawsuits: No. 26-371 (the John Bolton case), No. 26-847 (the OLC case), No. 26-920 (the Mar-a-Lago case), and No. 26-1214 (the ISCAP case). NARA is a defendant in all four cases. Archivist of the United States Bradford Wilson, DOJ, and Attorney General (AG) Todd Blanche are co-defendants in No. 26-920. The Court consolidated the cases for purposes of this motion. ECF 29 (No. 26-920).

[3] NARA surrendered physical custody of "original records within the [boxes President Trump voluntarily transferred to NARA] that bore classification markings" to the Department of Justice National Security Division. It retains copies of the records. McClure Decl. ¶ 5 n.1.

The cases divide into five parts:

- **Constructive records denial** (all counts except the below): Plaintiffs say NARA failed to respond to their PRA requests within 20 working days.
- **NARA referral to DOJ** (Counts 3 and 4 in No. 26-920): Plaintiffs say NARA must ask DOJ to "initiate action" to recover presidential records that DOJ sent President Trump.
- **FBI transfer of records to NARA** (Counts 5 and 6 in No. 26-920): Plaintiffs say the FBI must send NARA any remaining presidential records from the 2022 Mar-a-Lago search.
- **Expedited processing denial** (Counts 1, 3, 5, and 7 in No. 26-371): The parties plan to cross-move for summary judgment at an appropriate time.
- **Constructive appeal denial** (Count 2 in No. 26-1214): Defendant plans to move for summary judgment at an appropriate time.[4]

## LEGAL STANDARD

On a FED. R. CIV. P. 12(b)(1) challenge to subject-matter jurisdiction, the plaintiff bears the burden of establishing jurisdiction "in the same way as any other matter on which the plaintiff bears the burden of proof." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Thus, on a motion to dismiss, the complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). On a FED. R. CIV. P. 12(c) motion for judgment on the pleadings, the Rule 12(b) standards apply. *Massey v. Ojaniit*, 759 F.3d 343, 347 (4th Cir. 2014).

[4] NARA answered the original complaints in Case Nos. 26-847 (ECF 8) and 26-920 (ECF 8). Thus, NARA moves for judgment on the pleadings on all counts in No. 26-847 and Counts 1 and 2 in No. 26-920, and moves to dismiss all other counts except the expedited processing denial counts in No. 26-371; the constructive appeal denial counts in No. 26-1214; and the counts directed solely at the FBI (Counts 5 and 6 in No. 26-920). The Archivist moves to dismiss Counts 1-4 in No. 26-920. The DOJ Defendants (DOJ and AG) move to dismiss Counts 5 and 6 in No. 26-920.

## ARGUMENT

### I. The PRA Displaces FOIA's Response Deadlines, and Plaintiffs Have Largely Failed to Exhaust Administrative Remedies for Their PRA Requests

#### A. The Text and Structure of the PRA Confirm that Its Notice Deadline Supersedes FOIA's Statutory Timeframe

Plaintiffs seek presidential records, which means the PRA governs their record requests. The PRA uses FOIA as a procedural vehicle, but both laws must be read in context so that the statutory scheme makes sense. FOIA's procedural framework cannot neuter the PRA's notice provision, which gives presidents 60 working days (extendable to 90) to review potential disclosures. Because the Court cannot apply FOIA's 20-working-day response deadline to the PRA without neutering those notice rules, the deadline does not apply, and Plaintiffs have prematurely filed suit. Bedrock principles of statutory construction confirm this Court lacks jurisdiction.

*First*, the PRA's privilege review process is part of a broader legislative scheme, and forcing NARA to choose between the President's notice period and administrative exhaustion would nullify the statutory protections for executive privilege. "Statutes should be interpreted 'as a symmetrical and coherent regulatory scheme,'" *Mellouli v. Lynch*, 575 U.S. 798, 809-10 (2015) (citation omitted), and courts should "give effect, if possible, to every word Congress used." *National Ass'n of Mfrs. v. Dep't of Def.*, 583 U.S. 109, 128-29 (2018) (citation omitted). And because "Congress presumably does not enact useless laws," courts "hesitate to adopt an interpretation that would eviscerate such significant aspects of the statutory text." *Garland v. Cargill*, 602 U.S. 406, 427 (2024) (citation omitted) (first quote); *American Hosp. Ass'n v. Becerra*, 596 U.S. 724, 737 (2022) (second quote). In 2014, Congress enacted § 2208's privilege rules knowing full well what deadlines FOIA set. If it intended to authorize PRA suits after 20 days, it would make no sense to give the President up to 90 days to assert privilege. And if it intended to annul the doctrine of administrative exhaustion for all PRA suits by layering a 90-day

review period on a 20-day deadline, there were more straightforward ways to say so. *See Niz-Chavez v. Garland*, 593 U.S. 155, 167 (2021); *Biden v. Texas*, 597 U.S. 785, 798 (2022).

*Second*, the specific prevails over the general. The PRA covers a specific subset of record requests. That it uses FOIA as a procedural vehicle does not mean every word of FOIA applies. When two statutes conflict, "a specific statute closely applicable to the substance of the controversy at hand controls over a more generalized provision." *Farmer v. Emp. Sec. Comm'n of N.C.,* 4 F.3d 1274, 1284 (4th Cir. 1993); *see also Morton v. Mancari*, 417 U.S. 535, 550-51 (1974) ("[W]here there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment."). The specific notice period available to Presidents under the PRA should prevail over the general response timeline of FOIA. Indeed, Congress underscored the specificity of the PRA by explaining that presidential records would have been categorically exempt from FOIA *but for* the PRA.

*Third*, the current presidential notice period under the PRA was enacted in 2014, decades after FOIA. Under the last-in-time rule, "the more recent of two conflicting statutes shall prevail." *United States v. Under Seal*, 709 F.3d 257, 262 n.2 (4th Cir. 2013) (noting that when one statute was enacted in 1996 and the other was enacted in 2006, the later one should control). Congress knew what FOIA said when it enacted the PRA, and can override past FOIA laws by passing new FOIA laws. For example, in *Everytown for Gun Safety Support Fund v. Bureau of ATF*, 984 F.3d 30 (2d Cir. 2020), Congress had passed a law preventing disclosure of specific materials under FOIA; then passed the OPEN FOIA Act to impose additional procedural requirements on anti-disclosure laws; and then two months later renewed its anti-disclosure law with the same language as before. The Second Circuit concluded that the most recent anti-disclosure law controlled over the contrary terms of the OPEN FOIA Act. *See id.* at 34.

Here, Congress likewise enacted a more specific and irreconcilable law on an overlapping topic. It did so on the natural understanding that the new law would displace FOIA where it applied.

*Fourth*, the Supreme Court already clarified that the interpretation of the very FOIA response deadline at issue is governed by common sense. In *Kissinger v. RCFP*, the plaintiff FOIA requesters said their requests imposed a duty on the responding agency (there, the State Department) to sue to recover records that would have been responsive to the FOIA requests, but for the fact that a former Secretary of State had removed them from the agency before leaving office. 445 U.S. at 144-45, 152-53. The Supreme Court disagreed. It said the plaintiffs' position was so impractical that Congress could not have intended FOIA to function (or really, to not function) in that way. Pointing to the agency's then-applicable 10-working-day deadline to respond to FOIA requests, the Court explained that lawsuits could not be "waged and won in 10 days." *Id.* at 153. It declined to interpret FOIA in a way that would require the agency to do the impossible, instead concluding that Congress must have been "operating under the assumption that agencies would not be obligated to file lawsuits in order to comply with FOIA requests." *Id.* Here, Plaintiffs also interpret the PRA in a way that would require NARA to do the impossible. *Kissinger* rules out that kind of formalism for formalism's sake.

The PRA confirms a longstanding presidential notice timeframe that was codified long after FOIA. That timeframe overrides FOIA's short-fuse deadline, which interferes with each of these PRA goals. The PRA's text and structure confirm that Congress never intended to apply that deadline to the PRA. And because the PRA does not incorporate that FOIA deadline, it also does not incorporate FOIA's constructive-exhaustion penalty for missing that deadline.

### B. The PRA's Drafting, Legislative, and Implementation History Uniformly Confirm that Congress Never Intended FOIA's Deadline to Apply to the PRA

#### 1. Congress Attempted to Balance Disclosure Against the Privilege Interests of Both Incumbent and Former Presidents

Incumbent presidents may exercise constitutionally-based privileges to fulfill their constitutional duties, and former presidents may assert these privileges even after leaving office. The Supreme Court affirmed this principle in *Nixon v. Administrator of General Services (Nixon v. GSA)*, 433 U.S. 425 (1977), handed down one and a half years before the PRA became law. There, former President Nixon challenged the legality of the Presidential Recordings and Materials Preservation Act (PRMPA). *Id.* at 439. The Court "reject[ed] the argument that only an incumbent President may assert [executive privilege] claims," and held that former President Nixon could also assert the privilege. *Id.* The Court decided that the "confidentiality necessary to [the full and frank submissions of facts and opinions] cannot be measured by the few months or years between the submission of the information and the end of the President's tenure," and that "the privilege survives the individual President's tenure." *Id.* at 449.

The Court also recognized the Executive's role in establishing procedures to resolve privilege disputes *before* releasing records—including a notice period for privilege review. *See id.* at 441, 444 n.7. In disposing of former President Nixon's separation of powers challenge, the Court made the following points:

- Under the PRMPA, a privilege review would precede any release of records. *Id.* at 444.
- To facilitate a meaningful privilege review, the PRMPA "require[d] *meaningful notice* to [former President Nixon] of archival decisions that might bring into play [his legally or constitutionally based rights or privileges]." *Id.* at 444 n.7 (emphasis added).
- Although GSA's proposed regulations for providing such "meaningful notice" for privilege claims were not before the Court, *id.* at 437-38, the Court recognized that GSA had issued

> a non-final regulation to give former President Nixon advance notice of any disclosure, *id.* at 444 n.7 (citing 41 C.F.R. § 105-63.205 (1976) [sic; should be § 105-63.206(e)]). GSA said President Nixon would receive "prior notice"; the regulation included no time limit. *See id.* In addition, GSA said the *incumbent* President's counsel was also entitled to prior notice "to examine these materials and raise any objections, defenses, or privileges to prevent or limit the proposed access." 41 C.F.R. § 105-63.206(d) (1976).

It was on this understanding that the Supreme Court upheld the PRMPA.

And it was against this backdrop of *both* former and incumbent presidents holding a stake in executive privilege that the PRA said, "Nothing in this Act shall be construed to confirm, limit, or expand any constitutionally-based privilege which may be available to an incumbent or former President." 44 U.S.C. § 2204(c)(2). Courts "normally assume that, when Congress enacts statutes, it is aware of relevant judicial precedent." *Ryan v. Gonzales*, 568 U.S. 57, 66 (2013) (citation omitted). And here, the House Report on the PRA specifically walked the reader through the relevant holding of *Nixon v. GSA*. *See* H.R. Rep. No. 95-1487, at 6-7 (1978).

### 2. Congress Never Linked Executive Privilege to FOIA Deadlines

The privilege review process was never intended to overlap or otherwise operate in tandem with FOIA's short-fuse deadline. To the contrary, the PRA's legislative and drafting history shows that Congress expected the Executive to establish the procedures for invoking and contesting the executive privilege; that Congress declined to micromanage what regulations the Executive would set; and that Congress did not intend to subject privilege disputes to the FOIA process.

Congress continually tinkered with the bill throughout the year 1978, until the very day before the bill passed. In so doing, it did not simply ignore the matter of Presidential privilege review. In fact, executive privilege was fairly controversial. The relevant House Committee initially refused to give the Executive regulatory authority to establish rules for a former President

to review documents and invoke a constitutionally based privilege. In a series of last-minute adjustments to the PRA, the full Congress reversed course and gave the Executive that power.

Late in the drafting process, Congress added the modern-day 44 U.S.C. § 2206(3), which directed NARA to promulgate regulations to provide "notice … to the former President when the disclosure of particular documents may adversely affect any rights and privileges which the former President may have." *See* Presidential Records Act of 1978, 124 Cong. Rec. H34892, 34893 (Oct. 10, 1978). The earlier version reported out of committee had not contained this language. *See* H.R. Rep. No. 95-1487, at 17 (1978) (confirming that at the time, "no requirement of formal notice or consultation with the former President has been included"). Four days before the PRA passed, its drafters chose one of their own to explain the new language. Rep. Preyer confirmed there would be a privilege review process and that the new subsection was meant to facilitate that process. As he put it, "prior to release of [potentially privileged] documents, the Archivist will provide notice to the former President pursuant to regulations promulgated under the act and the former President could then, insofar as constitutionally permitted, assert any privilege in the judicial forum provided by the bill to challenge the intended disclosure." 124 Cong. Rec. at H34895.

Notably, Rep. Preyer said this at a time when the bill did not even contain the § 2204(c)(2) privilege provision. *See id.* at H34893. The Senate added that language three days later. On the floor, Rep. Preyer said that the bill was "intended neither to limit nor to expand any constitutionally based privilege." *Id.* at H34895. The Senate codified his opinion into statutory text, creating the modern-day § 2204(c)(2). "Preservation of and Public Access to Official Records of the President," 124 Cong. Rec. S36843, 36843 (Oct. 13, 1978) (Senate text); Presidential Records Act of 1978, 124 Cong. Rec. H38283, 38284 (Oct. 14, 1978) (House sponsor noting that the Senate language was drawn from Rep. Preyer's floor statement). Senator Percy, who introduced the

amendment, said the White House had agreed to the amendment and that Congress "cannot prevent a former or incumbent President from arguing … that a particular confidential communication" was privileged. *Id.* at S36844. The House accepted that amendment the next day. *Id.* at H38284.

President Carter echoed Rep. Preyer's assessment that the PRA did not displace executive privilege. His signing statement confirmed the common understanding that the PRA would "provide[] for the resolution of constitutional questions raised by disputes over the release of Presidential records." *Statement on Signing H.R. 13500 Into Law* (Nov. 6, 1978).

#### 3. The PRA's Timeline Overrides FOIA's Deadline in an Effort to Accommodate the Presidents' Privilege Interests

After the Supreme Court and Congress acknowledged that both incumbent and former Presidents held a stake in executive privilege, the natural follow-up question was how to apply that privilege in practice. Day-one practice informs how the enactors of a law understood it to work. *Alden v. Maine*, 527 U.S. 706, 743-44 (1999) (citing *Printz v. United States*, 521 U.S. 898, 905 (1997)). Similarly, historical practice informs how institutions view themselves in relation to each other. "In separation-of-powers cases [the Supreme] Court has often 'put significant weight upon historical practice.'" *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 23 (2015) (quoting *NLRB v. Noel Canning*, 573 U.S. 513, 524 (2014)) (emphasis removed in *Zivotofsky*).

From 1978 to 2014, Congress left it to the Executive Branch to establish procedural rules for incumbent and former Presidents to raise executive privilege. *See supra* § I.B.2; H.R. Rep. No. 113-127, at 5; S. Rep. No. 113-218 at 4 (2014). And the Executive Branch has never understood the PRA to require NARA to respond to PRA requests within the generic FOIA response deadline. The Executive has always granted itself a review period longer than FOIA's. This day-one practice was initially guided by executive orders that mandated notice periods (usually 30 calendar days) before NARA could release potentially privileged documents.

Congress adopted and ratified this practice when it amended the PRA in 2014 to codify the notice period and to extend it to 60 *working* days. S. Rep. No. 113-218 at 8.

At the end of his second term, President Reagan (the first president subject to the PRA) issued Executive Order (EO) 12667, 54 Fed. Reg. 3403 (Jan. 18, 1989), to govern how he and his successors would review privilege disputes. Section 2(b) of the EO gave incumbent and former Presidents a 30-day notice period. This alone was over twice as long as the ten-working-day FOIA response deadline in force at the time. *See* 5 U.S.C. § 552(a)(6)(A)(i) (1988). Even if NARA granted itself a ten-working-day extension under § 552(a)(6)(B), it could not comply. Also, the incumbent President was not required to *complete* her review of documents within 30 days; she could simply tell the Archivist "to extend the time period." EO § 2(b); *see also id.* § 3 (imposing no further time limits on privilege review for incumbent Presidents). Finally, the former President was entitled to an additional 30-day notice period if NARA or the incumbent President declined to uphold her privilege determination, so she could seek injunctive relief. *Id.* § 4(b).

The Government has followed this approach to this day. The privilege review period converged, but did not cross into, the FOIA deadline in 1997, when Congress extended the response period for generic FOIA requests from 10 to 20 working days. *See* Electronic FOIA Amendments of 1996 §§ 8(b), 12(b), Pub. L. No. 104-231, 110 Stat. 3048, 3052, 3054 (1996) (effective Oct. 2, 1997). After that, it was technically possible to comply with both the FOIA deadline and the Reagan EO notice period, provided that NARA granted itself a ten-working-day extension *and* both Presidents declined to invoke the privilege. However, the Reagan EO gave NARA no discretion to deny an incumbent President an extension.

Any surface-level resemblance to FOIA disappeared in 2001, when President Bush replaced the Reagan EO with Executive Order 13233, 66 Fed. Reg. 56025 (Nov. 1, 2001).

The Bush EO imposed no deadline on former Presidents to finish their privilege review, saying only that "requests that are not unduly burdensome" should be reviewed within 90 days. EO § 3(b). The incumbent President was not subjected to a time limit either. *Id.* § 3(d). And the incumbent President could not overrule a former President's privilege assertion. *Id.* § 3(d)(1)(ii).[5]

President Obama "effectively restored" the Reagan EO's 30-day review period (and its 30-day period to file suit) in Executive Order 13489 § 2(b), 74 Fed. Reg. 4669 (Jan. 21, 2009). H.R. Rep. No. 113-127 at 5 n.8. This EO governed privilege claims until 2014.

### 4. Instead of Questioning This Practice, Congress Formalized It

Congress' conduct over the last half-century confirms that the PRA has never required NARA to respond to PRA requests within the generic FOIA response deadline. For a quarter-century, Congress acquiesced to Presidential practice. If there was still any doubt about whether the PRA incorporated FOIA's deadline, Congress removed it when it amended the PRA in 2014.

Congress recognized the long history of executive practice and sought to displace it—but in a way that *sharpened* the PRA's clash with FOIA. The House Report aimed to "codify an executive order to fill an executive privilege related gap in the [PRA] while also streamlining outdated statutory recordkeeping language and making additional changes to improve the federal government's ability to capture and archive electronic records." H.R. Rep. No. 113-127 at 4; *see also id.* at 5 (seeking to line up "with the Reagan and Obama Administration frameworks"); S. Rep. No. 113-218 at 4 ("This is the same approach followed in President Reagan's Executive Order on the PRA."). The Senate Report put it more bluntly: absent an Act of Congress, "each successive President likely will issue his or her own executive order interpreting the original PRA."

[5] In 2007, a district court permanently enjoined the Bush EO notice period. *See American Hist. Ass'n v. NARA*, 516 F. Supp. 2d 90, 111-12 (D.D.C. 2007). The court said NARA had discretion to give a former President more than 30 days to conduct a privilege review, but that the Bush EO could not require NARA to always give more than 30 days. *Id.* at 110.

*Id*. at 3. So Congress imposed its own notice period—but extended it from 30 calendar days to 60 *working* days. It's hard to imagine *stronger* historical evidence to apply the plain statutory text.

### C. The Court Should Reject Plaintiffs' Naked Policy Rationale

In their opposition to NARA's first motion to dismiss, Plaintiffs argued that NARA must be wrong because the constructive-exhaustion rule is "the only part of FOIA that allows timely judicial review" and if NARA is right, it could run out FOIA's six-year statute of limitations by refusing to process a request. *See* ECF 52 at 13-14. For several reasons, that argument is wrong.

*First*, Plaintiffs wrongly imply that NARA will ignore their requests. In fact, NARA has already submitted one tranche of responses, including 290 assets, for privilege review. *See* July 23, 2026 McClure Letter, *supra*. NARA asks only that Plaintiffs wait their turn.

*Second*, Plaintiffs are wrong that there is no enforcement mechanism. If NARA failed to respond to a PRA request within six years, Plaintiffs could file an APA withholding claim—like the one they filed here. *See* FAC ¶¶ 52-58 (No. 26-920).

*Third*, Plaintiffs' argument fails because it turns on policy—and not even accurate policy. "[I]t frustrates rather than effectuates legislative intent simplistically to assume that *whatever* furthers the statute's primary objective must be the law," *Rodriguez v. United States*, 480 U.S. 522, 526 (1987). Given the textual evidence to the contrary, there is no basis to assume that by enacting the PRA, Congress necessarily wanted the district courts to supervise every PRA request. But that is the natural consequence of Plaintiffs' position. Disclosure is doubtless *one* goal of the PRA, *see* 44 U.S.C. § 2203(g)(1), but it is one of several. "[T]he limitations expressed in statutory terms [are] often the price of passage, and no statute yet known 'pursues its [stated] purpose [ ] at all costs.'" *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 89 (2017) (citation omitted). The PRA aims to balance the broader goal of disclosure with constitutionally grounded concerns about Executive Branch deliberation, stakeholder comments, and multiple layers of review.

Given the PRA's text and history, there is no reason to read the PRA in precise lockstep with FOIA. The two laws were passed in different contexts and reflect different Congressional priorities. FOIA's constructive-exhaustion rule impels agencies to process requests faster. Powerful as that may be, FOIA's short-fuse deadline would cut an ugly gash through the deliberative process Congress established in the PRA. The only plausible reading is that it does not apply to the PRA.

Even if the Court agrees that Plaintiffs' preferred reading would be good policy, that cannot dislodge what Congress actually wrote. "Congress generally 'intend[s] the full consequences of what it sa[ys]'—even if 'inconvenient, costly, and inefficient.'" *Thacker v. TVA*, 587 U.S. 218, 224 (2019) (citation omitted). The PRA's text is straightforward and compels an equally straightforward result. Plaintiffs sued too early, and their records-denial counts must be dismissed.

## II. NARA Is Not Required to Ask DOJ to "Initiate Action" Under the PRA (Counts 3-4, Case No. 26-920)

Plaintiffs bring APA and mandamus claims to compel NARA to ask DOJ to "initiate action" to recover presidential records seized from and returned to Mar-a-Lago. The PRA itself contains no analog to the redress statutes, but "[w]hen the Archivist considers it to be in the public interest, he may exercise" his FRA authority with respect to presidential records. 44 U.S.C. § 2112(c). Since the redress statutes provide for NARA to refer allegations that federal records have been wrongfully removed from federal custody, Section 2112(c) allows NARA to refer to DOJ allegations that presidential records have been wrongfully removed from federal custody. DOJ may then file common-law replevin actions to recover such records.

Relying solely on the FRA, Plaintiffs say the FRA does not simply enable, but also *requires*, NARA to refer this PRA case to DOJ for "action." *See* FAC ¶¶ 53 ("Under the FRA…."); 60 ("The FRA is clear…."); 61 ("the action that the FRA requires of the Archivist"); 60-62

(seeking "action"). But the source of NARA's authority to refer *PRA* cases—Section 2112(c)—is the classic example of a discretionary grant of authority. Therefore, neither the APA nor the Mandamus Act requires NARA to refer Plaintiffs' allegations to DOJ.

**A. NARA's Authority to Ask DOJ to "Initiate Action" to Recover Presidential Records Is Committed to Agency Discretion**

To bring APA failure-to-act and mandamus claims, Plaintiffs must show that the agency has a non-discretionary duty to act—that is, a "clear-cut duty" or "'a specific, unequivocal command,' over which an official has no discretion." *Murray Energy Corp. v. Adm'r of EPA*, 861 F.3d 529, 537 n.4 (4th Cir. 2017) (first quote); *City of N.Y. v. U.S. Dep't of Def.*, 913 F.3d 423, 432 (4th Cir. 2019) (second quote) (quoting *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 63 (2004)); *see also Lovo v. Miller*, 107 F.4th 199, 210-11, 216-17 (4th Cir. 2024); 5 U.S.C. § 706(1). These claims "do not empower a court to supervise an agency's compliance with a broad statutory mandate." *Murray Energy*, 861 F.3d at 537 n.4. Rather, a court "will only hold that an agency is mandated to act—and therefore that its failure to act is subject to judicial review—if there is a 'clear indication of binding commitment' imposed on the agency." *Lovo*, 107 F.4th at 211 (quoting *Norton*, 542 U.S. at 69). Thus, for Plaintiffs to succeed on their APA and mandamus claims, they must show that the PRA specifically directs NARA to seize all presidential records. It does not.

**1. The PRA Itself Imposes No Duty to Seize Presidential Records**

A record can either be a presidential record or a federal record—never both. The gravamen of the complaint is that the FBI transferred presidential records outside the Government. But while the PRA explicitly cross-references at least one statute (FOIA), it neither cross-references nor contains an analog of the FRA redress statutes. So "[t]here is no explicit statutory scheme for compelling the production of Presidential records" improperly removed from federal custody. *United States v. Navarro*, 664 F. Supp. 3d 48, 58 (D.D.C. 2023), *aff'd*, 2024 WL 1364354 (D.C.

Cir. Apr. 1, 2024), *reh'g en banc denied*, 2024 WL 2409431 (D.C. Cir. May 23, 2024), *cert. denied*, 145 S. Ct. 988 (2024); *cf. American Historical Ass'n v. Trump*, 2026 WL 1412395, at *10 (D.D.C. May 20, 2026) (suggesting that under the PRA standing alone, "it does not appear that NARA itself has enforcement authority to seek out presidential records unlawfully removed").

Even if this Court expanded its analysis to provisions purporting to establish ownership over records, that assessment would not change. The very paragraph of the PRA entrusting Presidential records to NARA imposes an "affirmative duty" on NARA to make available presidential records it does possess, but not to "initiate action" to recover presidential records it does not possess. *See* 44 U.S.C. § 2203(g)(1). By contrast, the FRA redress statutes specifically describe referring cases to DOJ when someone removes federal records from an agency. And "it is 'particularly inappropriate' to read language into a statute … 'when, as here, Congress has shown that it knows how to adopt the omitted language or provision.'" *Corner Post, Inc. v. Bd. of Governors of Fed. Reserve Sys.*, 603 U.S. 799, 814 (2024) (quoting *Rotkiske v. Klemm*, 589 U.S. 8, 14 (2019)); *cf. Polselli v. IRS*, 598 U.S. 432, 439 (2023) (invoking the *expressio unius est exclusio alterius* canon for a similar point). The PRA lacks the specific FRA language on which the complaint relies, and since no record can be both federal and presidential, neither the PRA nor FRA requires NARA to refer the removal of alleged presidential records to DOJ.

### 2. The Source of NARA's Authority to Initiate Litigation to Recover Presidential Records Does Not Impose a *Duty* to Litigate

NARA sometimes runs into situations where, in its discretion, it would *like* to recover presidential records. While the PRA itself is silent on how NARA might reclaim lost presidential records, a non-PRA section of Title 44 incorporates the FRA redress statutes in permissive terms. And it is the sole enforcement mechanism. That gives NARA unreviewable discretion to refer cases to DOJ. *See Judicial Watch, Inc. v. NARA*, 845 F. Supp. 2d 288, 301-02 (D.D.C. 2012).

NARA has statutory authority over "presidential archival depositories," which "house and preserve the papers and books of a President or former President of the United States[.]" 44 U.S.C. § 2101(1). The PRA directs NARA to deposit the presidential records that it acquires at the end of an outgoing President's term in office "in a Presidential archival depository or another archival facility operated by the United States." *Id.* § 2203(g)(2). And a non-PRA law says that "[w]hen the Archivist considers it to be in the public interest, he may exercise, with respect to papers, documents, or other historical materials deposited under this section, or otherwise, in a Presidential archival depository, all the functions and responsibilities otherwise vested in him pertaining to Federal records … in his custody or under his control." *Id.* § 2112(c). Since the authority to refer removals of federal records to DOJ is a "function[] … vested in [the Archivist]," and presidential records implicate NARA's Presidential archival depository responsibilities, NARA may refer cases to DOJ through the procedures set forth in the redress statutes. Following a referral, DOJ can then file common-law replevin actions to recover lost records, consistent with the Federal Government's "*right* to bring common law suits." *United States v. Moffitt, Zwerling & Kemler, P.C.*, 83 F.3d 660, 667 (4th Cir. 1996) (emphasis added).

Accordingly, two courts in the *Navarro* action held that under the common law, the Federal Government—like any other legal owner of property—has the option of suing to recover presidential records. In *Navarro*, the district court and D.C. Circuit authorized a lawsuit to recover emails from a former presidential adviser under the District of Columbia replevin statute, D.C. Code § 16-3702. The district court wrote that the Government "must be free to utilize those legal processes available to it whether or not they are expressly provided for by statute." *Navarro*, 664 F. Supp. 3d at 59. On appeal, relying on the foregoing Fourth Circuit authority, the D.C. Circuit agreed that the United States "'may bring suits to … protect [its] property'" and that the PRA does

not "affirmatively abrogate[] the United States' general authority to pursue common law remedies." *Navarro*, 2024 WL 1364354, at *2 (quoting *Cotton v. United States*, 52 U.S. (11 How.) 229, 231 (1850) and citing *Moffitt, Zwerling & Kemler*, 83 F.3d at 667).[6]

Based on this syllogism, the *Judicial Watch v. NARA* court held a private litigant could not force NARA to take legal action to recover alleged presidential records held by a former President. The NARA-DOJ referral process was both the "[s]ole [e]nforcement [m]echanism [a]vailable to the Archivist" and "the only enforcement tool[] provided to [NARA] under the PRA." 845 F. Supp. 2d at 302. Thus, the DOJ referral mechanism was "committed to the agency's sole discretion," and under *Heckler v. Chaney*, 470 U.S. 821, 831 (1985), the court could not review it. *Id.*

That holding was right, as the archival depository statute could not be clearer that the Archivist has full discretion to refer (or to not refer) a case. It operates through the word "may" and gives NARA freedom to decide when litigation is in "in the public interest." *See Lopez v. Davis*, 531 U.S. 230, 241 (2001) (the word "may" is "permissive" and contrasts with words that assign "discretionless obligations"); *Claybrook v. Slater*, 111 F.3d 904, 908 (D.C. Cir. 1997) (phrase "whenever [the agency representative] determines it to be in the public interest" precluded review); *cf. United States v. T.M.*, 413 F.3d 420, 425 (4th Cir. 2005) ("[w]hether a 'substantial federal interest' exists" connoted discretion in the prosecutorial context). Therefore, when exercising FRA powers, Congress "vest[ed] complete discretion with [NARA] to utilize th[e] mechanism" of a referral to the Attorney General. *Judicial Watch*, 845 F. Supp. 2d at 302.

Even after a referral, DOJ would retain discretion to bring—or to not bring—a replevin

[6] Indeed, while the PRA does not cover pre-Reagan administrations, *see* PRA § 3, 92 Stat. at 2528, the Government has still sued to recover pre-Reagan records. *See United States v. Zook*, No. 12-cv-1465 (D. Md.) (lawsuit to recover handwritten pardon drafted by President Lincoln); *United States v. McElvenny*, No. 02-cv-3027 (S.D.N.Y.) (lawsuit to recover, *inter alia*, a map of Cuba President Kennedy used and personally annotated during the Cuban Missile Crisis).

suit. As *Navarro* recognized, the Federal Government has "free[dom] to utilize" its common-law rights of action, 664 F. Supp. 3d at 59. And litigants are usually free to decline to file suit.[7]

**B. Plaintiffs' Injuries Are Not Redressable by a Favorable Judicial Decision**

If a party's proposed remedy will not address its functional injury, that party lacks standing. *See Town of Castle Rock v. Gonzales*, 545 U.S. 748, 764 (2005) (a *procedural* proposal to force law enforcement to seek arrest warrants cannot redress the *substantive* injury of legal under-enforcement, since prosecutorial discretion remains). By a similar token, "[i]t is a federal court's judgment, not its opinion, that remedies an injury," *dmarcian, Inc. v. DMARC Advisor BV*, 182 F.4th 289, 308 (4th Cir. 2026) (citing *Haaland v. Brackeen*, 599 U.S. 255, 294 (2023)), so a plaintiff may not satisfy the redressability element of standing by suing merely to obtain a statement that a past government action was incorrect. Thus, if a referral to DOJ would not redress Plaintiffs' underlying informational injury, Plaintiffs lack standing to demand even a referral.

Here, there is little basis to conclude that NARA or DOJ would exercise their discretion to refer or to litigate this allegation or that any such lawsuit would prevail. The complaint puts few cards on the table, but its theory goes all-in. Not unlike *Judicial Watch v. NARA*, the complaint vaguely proposes that the Court order a referral to "initiate action or seek other legal redress to recover the[] records." FAC ¶¶ 58, 65. Plaintiffs' failure to "identify anything specific the Court could or should order the [Government] to do under these circumstances" "underscores the lack of redressability fatal to that case." 845 F. Supp. 2d at 303. In reality, "[b]ecause the [records] are not physically in the government's possession … it would be required to seize them directly from [the President] in order to assume custody and control over them." *Id.* at 302. In *Judicial Watch v.*

[7] DOJ's independent discretion parallels the broader principle that DOJ is required to approve lawsuits on NARA's behalf. *See* 28 U.S.C. § 516 (litigation by the Government is usually "under the direction of the Attorney General"); 44 U.S.C. §§ 2905(a), 3106(a) (under the FRA redress statutes, litigation to recover lost records goes "through the Attorney General").

*NARA*, the court called such relief an "'extraordinary request' … contrary to traditional principles of administrative law.'" *Id.* at 302-03. In short, it is highly "speculative[] that [Plaintiffs'] injury will be redressed by a favorable decision" on the referral issue. *Lujan*, 504 U.S. at 561 (simplified).

### C. If the President Designated Trump 1 Records as Personal Records While in Office, the Court May Not Review that Designation

Under the PRA, a president's personal records are *not* presidential records. *See* 44 U.S.C. § 2201(2)(B)(ii). In *Judicial Watch. v. NARA*, a FOIA requester sought to compel NARA to ask DOJ to "initiate action" under the FRA to recover audiotapes of interviews with President Clinton, which the President "retained … in his personal possession when he left office." *See* 845 F. Supp. 2d at 290-91. It asked the district court to "declare the audiotapes to be Presidential records under the PRA" and to "order [NARA] to 'assume custody and control' of the audiotapes." *Id.* at 293. But the audiotapes were "diaries" that the PRA facially categorizes as personal. *See* 44 U.S.C. § 2201(3)(A) (defining the term "personal records" to "include … diaries, journals, or other personal notes").

Judicial Watch disputed the audiotapes' status as personal records, but the district court responded that even if the PRA obligated NARA "to take responsibility for [presidential] records" by initiating action to recover said records,[8] no obligation would trigger until the records were actually designated as presidential records, which the audiotapes were not. 845 F. Supp. 2d at 300. And under the PRA, the President had "sole[]" authority to designate records from his first term as either personal or presidential. *Id.* at 301.

Accordingly, this Court may not review any designation of personal records that President

[8] In dicta, the court recognized Judicial Watch's view that the phrase "assume responsibility" in 44 U.S.C. § 2203(g)(1) "create[d] a mandatory duty that can be enforced." *See id.* at 300 & n.7. But as this brief explains, the court sidestepped the question by concluding that even if the answer was yes, Judicial Watch's injury was not redressable.

Trump may have made while in office. The PRA vests a sitting President with "virtually complete control" over his records, which impliedly precludes judicial review of a President's decisions to designate records as either personal or presidential. *Armstrong v. Bush (Armstrong I)*, 924 F.2d 282, 291 (D.C. Cir. 1991) (precluding "judicial review of the President's general compliance with the PRA at the behest of private litigants"). By contrast, courts may review guidelines that distinguish between presidential and federal records, as that distinction triggers the FRA's stricter regulatory regime. *See Judicial Watch v. NARA*, 845 F. Supp. 2d at 297 (explaining that *Armstrong II*, 1 F.3d at 1292-93, "address[ed] a concern that too many records were being classified as Presidential, not too few"). But *Armstrong II* "left untouched that portion of *Armstrong I* that gave the President unfettered control over his own documents." *Id.*

## III. Private Plaintiffs Lack Both Standing and a Statutory Basis to Challenge Which Federal Agency Houses Presidential Records (Counts 5-6, Case No. 26-920)

Counts 5 and 6 seek an order requiring the FBI to send NARA any remaining presidential records in its possession. The PRA asserts that presidential records are property of the Federal Government. 44 U.S.C. § 2202. But unlike Counts 3 and 4, the Federal Government possesses the records at issue—just not the specific agency Plaintiffs prefer. So these counts are premised on 44 U.S.C. § 2203(g)(1), which directs NARA to assume responsibility for presidential records.

### A. Plaintiffs' Informational Injury Does Not Permit Them to Sue Under the APA or Mandamus Act to Transfer Records from the FBI to NARA

Plaintiffs assert an informational injury as to the alleged records in the FBI's possession. Namely, they say they have a cognizable "interest in ensuring that these records are maintained, preserved, and made accessible to the public[.]" FAC ¶¶ 69, 76. But even assuming that is true, Plaintiffs fail to show any certainly impending or concrete injury to this interest. The FBI must preserve records in its custody and control consistent with federal law and applicable records schedules. And Plaintiffs allege nothing to say that the FBI will fail to comply with its obligations

to preserve materials as required by federal law. Plaintiffs also fail to show that they have made any FOIA request to the FBI for the records they want the FBI to send NARA, much less that such a request has been denied. *See, e.g.*, *National Family Planning & Repro. Health Ass'n, Inc. v. Gonzales*, 468 F.3d 826, 831 (D.C. Cir. 2006) (when the plaintiff thought it had found "conflicts … between [an] amendment and the regulations," it should have asked the agency to clarify its position instead of suing immediately, and its failure to ask the agency was a self-inflicted harm that precluded standing). Plaintiffs thus lack standing for Counts 5 and 6.

For the same reasons, Plaintiffs may not sue under the APA or the Mandamus Act. Before a plaintiff may sue under the APA, the statute requires that "there [be] no other adequate remedy" provided by any other statute. 5 U.S.C. § 704. Similarly, a plaintiff seeking mandamus must show that "no other adequate remedy is available." *In re First Fed. Sav. & Loan Ass'n of Durham*, 860 F.2d 135, 138 (4th Cir. 1988). "Courts have stated that an adequate alternative remedy 'does not need to provide relief 'identical' to that available to a party under the APA—it must merely be of the 'same genre.''" *AFSCME v. SSA*, 771 F. Supp. 3d 717, 791-92 (D. Md. 2025) (quoting *Westcott v. McHugh*, 39 F. Supp. 3d 21, 33 (D.D.C. 2014)).

There is "little doubt that FOIA offers an 'adequate remedy' within the meaning of section 704." *Elec. Priv. Info. Ctr. v. IRS*, 910 F.3d 1232, 1244 (D.C. Cir. 2018) (citation omitted). The APA does not "authorize[] a recipient of government information to initiate a private action to compel governmental conduct that might improve that information's accuracy or comprehensiveness." *Humane Soc. of the U.S. v. U.S. Fish & Wildlife Serv.*, 838 F. App'x 721, 732 (4th Cir. 2020); *see also id.* at 732-33 (noting that in *City of New York*, 913 F.3d at 430-31, the Fourth Circuit held people with access to a government information database could not bring an APA suit to demand improvements to the database, and that the same logic applied to FOIA).

More broadly, "courts 'have uniformly declined jurisdiction over APA claims that sought remedies made available by FOIA.'" *McKenzie-El v. IRS*, 2020 WL 902546, at *12 (D. Md. Feb. 24, 2020) (citing *Feinman v. FBI*, 713 F. Supp. 2d 70, 76 (D.D.C. 2010)). And the same principles also bar Plaintiffs' mandamus claim. *See Seumanu v. Dep't of Navy*, 2025 WL 2986806, at *6 (D. Md. Oct. 23, 2025) (FOIA claim precluded "claims under the APA, Mandamus [Act], All Writs Act, and [Declaratory Judgment Act]").

### B. Plaintiffs May Not Short-Circuit the PRA's Administrative Enforcement Scheme by Asking the Court to Enjoin the FBI Directly

Even if Plaintiffs had standing to sue the FBI, their claims would still fail. The PRA's referral procedure provides the exclusive vehicle to move a record to NARA, but Plaintiffs are suing the FBI directly to demand an injunction that NARA itself has not requested. As set forth above, the PRA allows NARA, "[w]hen the Archivist considers it to be in the public interest," to invoke the FRA's enforcement scheme. 44 U.S.C. § 2112(c). And under the FRA's scheme, the exclusive method for bringing lost records back to NARA is for NARA to "request the Attorney General to initiate" an action for the recovery of missing records under the FRA's redress provision, 44 U.S.C. § 2905(a). In enacting and amending the FRA, Congress "decided to rely on administrative enforcement, rather than judicial review at the behest of private litigants, to prevent the destruction or removal of records." *Armstrong I*, 924 F.2d at 294 (adding that "it would clearly contravene this system of administrative enforcement to authorize private litigants to invoke federal courts"). This Court may not review Plaintiffs' claims against the FBI.

## CONCLUSION

For the foregoing reasons, in Case No. 26-371, the Court should dismiss Counts 2, 4, 6, and 8-12. In Case No. 26-847, the Court should dismiss the case. In Case No. 26-920, the Court should dismiss the case. In Case No. 26-1214, the Court should dismiss Counts 1 and 3-6.

Dated: September 16, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General, Civil Division

ELIZABETH J. SHAPIRO
Deputy Director, Federal Programs Branch

*/s/ Winston Shi*
JOHN BAILEY (OH Bar No. 104260)
Counsel to the Assistant Attorney General
WINSTON SHI (NY Bar No. 5747068)
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Phone: (202) 880-0387
Email: winston.g.shi@usdoj.gov

*Counsel for Defendants*